102 Cal.Rptr.2d 214 (2000)
85 Cal.App.4th 508
Gil GARCETTI, as District Attorney, etc., Petitioner,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Paul Marentez, Real Party in Interest.
No. B143330.
Court of Appeal, Second District, Division Five.
December 14, 2000.
Review Granted March 21, 2001.
*216 Gil Garcetti, District Attorney, George M. Palmer, Patrick D. Moran and Fred Klink, Deputy District Attorneys, for Petitioner.
No appearance for Respondent.
Michael P. Judge, Public Defender, Albert J. Menaster, John Douglas and Jack T. Weedin, Deputy Public Defenders, for Real Party in Interest.

*215 INTRODUCTION
WEISMAN, J.[*]
On July 17, 2000, the trial court dismissed a petition filed by the District Attorney of Los Angeles County (petitioner) alleging that real party in interest, Paul Marentez (Marentez), was a sexually violent predator as described by the Sexually Violent Predators Act (Welf. & Inst.Code, ง 6600 et seq.) in that he had been convicted of two specified sex crimes against children under 14 that involved substantial sexual conduct and therefore constituted "sexually violent offenses," and he had a diagnosed mental disorder that made him a danger to the health and safety of others in that it was likely that he would engage in sexually violent criminal behavior if released from the jurisdiction of the Department of Corrections. The trial court dismissed the petition following a statutorily mandated probable cause hearing in which the burden was on petitioner to establish that there was probable cause to believe that Marentez was likely to engage in sexually violent predatory criminal behavior if released from custody. (Welf. & Inst. Code, ง 6602, subd. (a).) The trial court dismissed the petition even though it considered the probable cause issue to be a "close case," because "the Court does not find that the evidence supports a reasonable belief that Mr. Marentez is more likely than not to reoffend in a sexually violent manner. . . ."
The trial court set forth with great specificity the reasoning process it utilized in reaching its conclusion that the evidence failed to reach the standard of probable cause that would be required in order for it to order Marentez to stand trial on the ultimate allegation he was a sexually violent predator. Basically, the trial court stated that it viewed itself as the "trier of fact" and was "obligated" to resolve any conflicts that existed in the expert opinion testimony presented by both sides and to decide which expert it personally found most persuasive and "credible" based on its examination of the "underlying reason[s]" for the opinions expressed by the experts.
In assessing the "underlying reason[s]" for the opinions rendered by petitioner's experts, the trial court made clear that it *217 believed an actuarial instrument could not be relied upon by the experts at a probable cause hearing unless it was shown that predictions of future dangerousness based on such an instrument reached the level of reasonable "certainty," and that actuarial evidence that does not predict the likelihood of recidivistic conduct with reasonable "certainty" was "worthless for purposes of establishing probable cause." The trial court found the actuarial instrument relied upon by petitioner's experts, the Static-99 instrument, was "not reliable enough according to accepted scientific principles" to establish that Marentez was more likely than not to commit a sexually violent offense. The trial court concluded this line of reasoning by ruling that using statistical probability such as that necessarily involved in an actuarial approach to deprive someone of a liberty interest by making predictions of future dangerousness was an unconstitutional violation of due process in a civil proceeding under the Sexually Violent Predators Act because the ultimate standard of proof at the trial stage was beyond a reasonable doubt.
The trial court further determined that Dr. Barrie Glen, one of two experts called by petitioner, did not utilize any clinical factors to "adjust" the score produced by the actuarial instrument in order to support her conclusion that Marentez was likely to reoffend if released. The trial court observed that the guidelines for the actuarial instrument noted that the raw score should be "adjusted" up or down by use of various clinical factors, and therefore rejected the opinion of Dr. Glen as lacking a sufficient basis. The trial court noted that Dr. Jack Vognsen, the other expert called by petitioner, did use clinical judgment in addition to the actuarial instrument to "adjust" the raw score, but nevertheless rejected his opinion because the court also found he "relied" on the actuarial instrument, which the court had previously ruled was not reliable enough to form the basis of an expert opinion. The trial court stated it personally found the testimony of Marentez's experts to be more "credible" since the experts called by petitioner relied primarily or solely on "unreliable" actuarial instruments, and therefore ruled that the evidence presented at the hearing did not support a reasonable belief that Marentez "is more likely than not to reoffend in a sexually violent manner...." The trial court found the petition not true and the petition was dismissed. The trial court stayed the release of Marentez on parole for three weeks.
On August 9, 2000, petitioner filed a petition for a writ of mandate asking this court to issue a writ of mandate ordering the trial court to: (1) set aside its order finding the petition not true; (2) enter an order reinstating the petition; (3) enter an order finding probable cause exists; and (4) set the case for trial. Petitioner asserted that its remedy by way of appeal was inadequate because Marentez would be released on parole while the appeal was pending. On August 17, 2000, this court stayed the release of Marentez until further order of the court and issued an Order to Show Cause why the relief requested should not be granted.[1]
In its petition for writ of mandate, petitioner asserts that while the trial court characterized its determination that it found the experts called by Marentez to be more persuasive as being one of "credibility," the court was not really making a "credibility" determination, but was in fact *218 simply ruling on the legal sufficiency of the evidence and rejecting the opinions of petitioner's experts based on its legal determination that their use of an actuarial instrument in this case was not permissible (1) because the actuarial instrument did not meet standards of admissibility for new scientific devices, and (2) because statistical predictions from actuarial instruments could not be considered in a proceeding where a liberty interest was at stake and where the ultimate standard of proof in any subsequent trial stage of the case was beyond a reasonable doubt.
Petitioner argues that the trial court never found petitioner's experts were lying or mistaken as to the data underlying their opinions, but simply rejected their opinions because of its determination that the evidence was legally insufficient as a matter of law to support their opinions. Petitioner asserts that such a determination as to the legal sufficiency of the evidence can be reviewed by this court in order to discern whether the evidence presented at the probable cause hearing established probable cause as a matter of law.
We agree that the trial court erred in rejecting outright the actuarial evidence at the probable cause hearing, and that the record of the hearing demonstrates that sufficient admissible evidence was presented through the testimony of Dr. Vognsen to provide probable cause to set the matter for trial even if the court acted within its discretion in rejecting the opinion of Dr. Glen after finding that Dr. Glen did not utilize the actuarial instrument correctly when she failed to adjust the raw score with additional clinical data. We will therefore issue a peremptory writ of mandate ordering the trial court to (1) vacate its previous order of dismissal, (2) enter an order finding probable cause, and (3) set the matter for trial.

PROCEDURAL AND FACTUAL BACKGROUND

1. Summary of the Sexually Violent Predators Act

In 1995, the Legislature enacted the Sexually Violent Predators Act. (Welf. & Inst.Code, ง 6600 et seq.) Under the Act, a person currently incarcerated, either on a determinate sentence or for a violation of parole, can be declared a sexually violent predator following a jury trial when the jury finds beyond a reasonable doubt that the person suffers from a diagnosed mental disorder that makes them a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior, and when the person has been convicted of specified "sexually violent offenses," which were committed against two or more victims, and were committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, or were committed on a child under the age of 14 and involved substantial sexual conduct. (Welf. & Inst. Code, งง 6600, 6601, 6603, 6604.) If a person is found by a jury to be a sexually violent predator, he or she shall be committed for two years to the custody of the Department of Mental Health for appropriate treatment and confinement in a secure facility.[2] Confinement cannot exceed two years unless a new extended commitment is obtained from a court under the provisions of the Welfare and Institutions Code. (Welf. & Inst.Code, ง 6604.)
The process of identifying sexually violent predators begins while the person is incarcerated. The Department of Corrections is to screen an inmate who may qualify as a sexually violent predator at *219 least six months before the scheduled release date to determine if the inmate is likely to be a sexually violent predator. (Welf. & Inst. Code, ง 6601.) If officials find the inmate is likely to be a sexually violent predator, the inmate is referred to the Department of Mental Health for a "full evaluation" as to whether the inmate meets the statutory criteria for sexually violent predators. (Welf. & Inst.Code, ง 6601.)
The Department of Mental Health is required to evaluate the inmate in accordance with a standardized assessment protocol, developed and updated by the Department of Mental Health. (Welf. & Inst. Code, ง 6601, subd. (c).) The inmate is to be evaluated by two practicing psychiatrists or psychologists designated by the Department of Mental Health. (Welf. & Inst.Code, ง 6601, subd. (d).) If both evaluators agree that the inmate is mentally disordered and dangerous within the meaning of Welfare and Institutions Code section 6600, the Department of Mental Health transmits a request for a petition for commitment to the county in which the inmate was last convicted.[3] (Welf. & Inst. Code, ง 6601, subds. (d), (h) & (i).) If the designated counsel for the county[4] concurs with the recommendation, a petition for commitment shall be filed in the superior court. (Welf. & Inst.Code, ง 6601, subd. (i).)
After the filing of a petition for commitment in the superior court, the court is required to hold a limited hearing to determine if there is "probable cause" to believe the person named in the petition is likely to engage in sexually violent criminal behavior upon release. (Welf. & Inst.Code, ง 6602, subd. (a).) At the hearing on this limited issue, the alleged predator is entitied to the assistance of counsel, and "to be fully heard" on the issue of probable cause. (Welf. & Inst.Code, ง 6602, subd. (a); In re Parker (1998) 60 Cal.App.4th 1453, 1466, 71 Cal.Rptr.2d 167.) To this end, the alleged predator is entitled to cross-examine any experts relied upon by the petitioner, and to present written and oral evidence bearing on the issue of probable cause. (In re Parker, supra, 60 Cal. App.4th at pp. 1468-1470, 71 Cal.Rptr.2d 167.) The probable cause hearing thus allows the alleged predator a chance to challenge the facts on which the petition was filed by "challeng[ing] the accuracy" of the attached evaluations of the experts that found he met the criteria for a sexually violent predator. (Id. at pp. 1468, 1470, 71 Cal.Rptr.2d 167.) This provides the alleged predator "`"a chance to be heard"'" rather than treating him as a nonperson who is only entitled to a mere paper review of the reports. (Id. at p. 1469, 71 Cal.Rptr.2d 167.) The probable cause hearing, however, is only a limited hearing on the issue of probable cause to believe that the alleged predator is likely to engage in sexually violent predatory criminal behavior if released, and the statutory scheme "evidences an intent to make the `trial' the main contested venue for finally determining whether a proposed [sexually violent predator] is truly qualified for further involuntary civil commitment." (Id. at p. 1466, 71 Cal.Rptr.2d 167.)
The standard of proof at the probable cause hearing is not specifically spelled out in the Sexually Violent Predators Act, but it appears that the standard should be the same as that employed at a preliminary hearing in a criminal case, which is also a hearing to establish whether there is probable cause to hold a subsequent trial.[5] *220 We conclude, therefore, that the standard to be utilized at the probable cause hearing under Welfare and Institutions Code section 6602, subdivision (a), is whether there exists such a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a "strong suspicion" that the person named in the petition is likely[6] to engage in sexually violent predatory criminal behavior upon their release from custody. (Welf. & Inst.Code, ง 6602, subd. (a); see People v. Slaughter (1984) 35 Cal.3d 629, 636, 200 Cal.Rptr. 448, 677 P.2d 854 [defining "probable cause" in the context of a felony preliminary hearing].)
In People v. Slaughter, supra, 35 Cal.3d at pages 637-638, 200 Cal.Rptr. 448, 677 P.2d 854, the court noted that in utilizing this standard, the magistrate at the preliminary hearing is working within the framework of a "limited" role. The court reiterated that the probable cause proceeding is not a trial, and "`if the magistrate forms a personal opinion regarding the guilt or innocence of the accused, that opinion is of no legal significance whatever in view of the limited nature of the proceedings.'" (Id. at p. 637, 200 Cal.Rptr. 448, 677 P.2d 854.) The Slaughter court emphasized that "the magistrate is not a trier of fact" and further stated that the magistrate at such a probable cause hearing "does not decide whether defendant committed the crime," but only whether there is some rational ground for assuming "the possibility" that an offense has been committed and the accused is guilty of it. (Ibid.)
In Slaughter, the court also noted that "in many cases [the magistrate] will not find it necessary to resolve all conflicts in the evidence, in order to find probable cause to hold the defendant for trial."[7] *221 (People v. Slaughter, supra, 35 Cal.3d at p. 637, 200 Cal.Rptr. 448, 677 P.2d 854.) The court commented that even when a defendant cross-examines and presents affirmative evidence in order to contest the prosecution's case, the magistrate must not "back away" from the standard of "reasonable suspicion" of guilt and decide as a question of fact what crimes, if any, the defendant committed. (Id. at p. 638, fn. 5, 200 Cal.Rptr. 448, 677 P.2d 854.)
The court conducting a probable cause hearing under the Sexually Violent Predators Act must apply the foregoing principles to the probable cause hearing to determine if the evidence presented at the hearing, including the evaluators reports, the testimony of the experts, and any other evidence, would lead a person of ordinary caution or prudence to entertain a strong suspicion that the alleged predator is likely to engage in sexually violent predatory criminal behavior upon their release from custody.[8] If the court finds that no probable cause exists, it must dismiss the petition. If the court finds that probable cause exists, it then orders a trial to determine whether the alleged predator is in fact a sexually violent predator within the meaning of Welfare and Institutions Code section 6600. The alleged predator must remain in a "secure facility" between the time probable cause is found and the time trial is complete. (Welf. & Inst.Code, ง 6602.)
At trial, either side may demand and receive a trial by jury. (Welf. & Inst. Code, ง 6603, subds. (a), (b).) The trier of fact at trial must determine whether the requirements for classification as a sexually violent predator have been proven beyond a reasonable doubt and any jury verdict on the issue must be unanimous. (Welf. & Inst.Code, ง 6604.) If this burden is not carried, the person is released from prison when their term expires. If the burden is met and the requisite findings are made that the person is a sexually violent predator, "the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility. . . ." (Welf. & Inst.Code, ง 6604.)
Confinement cannot exceed two years unless a new petition is filed and an extended commitment is obtained from the court. (Welf. & Inst.Code, ง 6604.) The Act also contains provisions for annual reviews and probable cause hearings to determine if the person's mental health has changed so that they are no longer a danger to others. (Welf. & Inst.Code, ง 6605.) Also, if the Department of Mental Health at any time has reason to believe that a person's mental health has improved so that they are no longer a sexually violent predator, judicial review of the commitment must be sought. If the court accepts the recommendation, the person is entitled to release. (Welf. & Inst.Code, ง 6605, subd. (f).) The Act also provides a procedure whereby conditional release from confinement can be ordered on request of either the Department of *222 Mental Health or the person being confined. (Welf. & Inst.Code, งง 6607, 6608.)

2. The Evidence Presented at the Probable Cause Hearing by Petitioner

A. The Reports and Testimony of Barrie Glen, Ph.D.[9]
Dr. Glen is a licensed psychologist who is currently in private practice and provides psychological assessments and expert testimony in criminal cases and in sexually violent predator cases. She is familiar with actuarial risk assessment studies and other major studies in the area of sexually violent predators. She specifically received training from the Department of Mental Health on the use of the Rapid Risk Assessment for Sexual Offense Recidivism Scale (RRASOR) instrument and also on the use of the Static-99 instrument. Dr. Glen prepared two sexually violent predator evaluation reports on Marentez. One report was dated July 10, 1998, and the other report was an "Addendum Report" dated April 30, 2000.
In the first report, dated July 10, 1998, she noted that Marentez had been convicted in 1994 of two counts of lewd and lascivious acts on a child under the age of 14 (Pen.Code, ง 288, subd. (a)) that were committed on the same victim, and that he was sentenced to eight years in the state prison. The victim was a six-year-old boy who lived with his father. The boy and his sister were visiting their mother on a weekend. Marentez was living with the mother at the time. The mother, Marentez, and the two children went to the YMCA to swim. Marentez and the six-year-old boy then went into the men's locker room to shower and dress. During the shower, Marentez began to wash the boy's penis. While he was doing this, Marentez had an erection. Marentez then forced the boy to touch Marentez's penis for one minute.
In the same report, Dr. Glen noted that Marentez had also been convicted in 1988 of one count of lewd and lascivious acts on a child under the age of 14 (Pen.Code, ง 288, subd. (a)) and was sentenced to three years in the state prison. The victim in that case was a three-year-old boy who had gone to church with his mother. The boy's mother began calling for him after church services ended and she lost sight of her child. She went to the men's bathroom to see if her son was there. When the bathroom door opened she saw Marentez leaning down tying the boy's shoes. The three-year-old boy was pale and trembling, and he ran to his mother. The boy told his mother that Marentez had "sucked" on his penis. He said that Marentez had lured him into the bathroom by promising to give him some candy.
Marentez was interviewed by Dr. Glen about these two prior convictions. He denied committing the offenses against the six-year-old boy and said he spent almost no time alone with the boy and hardly knew him. As to the incident in church with the three-year-old boy, Marentez said that he had been using drugs and could not remember what occurred. He did acknowledge that "something may have happened" that was inappropriate, but did not provide any details.
Dr. Glen reported that Marentez told her he had lived with his mother and father, but there was a period of time when he had to live with an older couple during the weekdays while his parents worked. He said that at age 11 he lived with his parents, but his father spent very little time at home. His mother was an alcoholic who screamed at him and his father, and had to be physically restrained on occasion. *223 He often had to "clean up" his mother. He became sexually promiscuous at age 13. He married at age 18, but that marriage lasted only two months. He married again at age 21 and the marriage lasted for 10 years before ending in divorce. The marriage produced two children. He stated that he had over 100 sexual partners in his lifetime. He also stated that he had performed sex for money and had sex with a male roommate on one occasion.
Dr. Glen reported that in 1973, at age 17, Marentez was sent to a juvenile camp for marijuana possession and escaped. He supported himself in part after leaving home at age 19 by selling drugs. In 1974, he served 180 days in jail for possession of marijuana for sale. In 1975, he was convicted of grand theft of an automobile and placed on three years of probation. In 1980, he was arrested for lewd and lascivious acts on a child, based on allegations that he lured a five-year-old girl into the back of a shoe store where he worked by offering her free shoes, and then placed his finger in her vagina and orally copulated her. He was ultimately acquitted of that offense in a jury trial. In 1993, he was convicted of battery after he assaulted his apartment manager while drunk. He was placed on probation for 24 months and served 6 months for violating his parole.
Dr. Glen administered a number of tests to Marentez. The Hare Psychopathy ChecklistโRevised (PCL-R) Test was administered and Marentez score was in the moderate range for psychopathy. The Millon Clinical Multiaxial InventoryโII (MCMI-II) Test was administered which is a standardized assessment of mental disorders. Marentez attempted to make himself look "better" than he is, but the profile was still valid. He demonstrated significant elevations on four scales suggesting long-term dysfunctional ways of coping. Persons who exhibit this profile tend to search for relationships where they can lean on or exploit others for their own needs for admiration and acceptance. Affection is sought from every source and in every context.
Based on her review of Marentez's history, his interview, and the tests that were administered, Dr. Glen diagnosed Marentez as having a mental disorder of nonexclusive pedophilia relating to both genders, and also a mental disorder of polysubstance abuse, which was in remission. Dr. Glen found that Marentez met the Diagnostic and Statistical Manual of Mental Disorders (DSM) requirements of pedophilia in that he had recurrent intense sexual fantasies, sexual urges or sexual behaviors involving sexual activity with children 13 or younger for a period of over 6 months. Since Marentez could not control his urges and behaviors and thus had ended up incarcerated because of them, Dr. Glen found that his urges and behaviors impaired his normal functioning.
Dr. Glen's report indicated that in her "clinical" opinion, Marentez was likely to commit a new sexually violent crime if released. She based this opinion on "a broad compilation of factors, including researched risk factors, behavioral factors, diagnostic factors, and my clinical experiences with sex offenders over the years." She noted in her report that (1) a diagnosed mental disorder of pedophilia has been correlated with an increased likelihood of sexual reoffense, (2) arrests for prior sexual offenses have been correlated with the probability of future sexual offenses, (3) arrests for any type of an offense have been correlated with a higher risk of reoffense, (4) selection of a male victim has been correlated to a higher risk of reoffense, and (5) selection of a "stranger" victim has been correlated with a risk of reoffense. She also noted the importance of specific behavioral and clinical indicators which in her clinical experience indicated an increased risk of reoffense. These included Marentez's traumatic background, his abuse of drugs which he utilized in an attempt to cope, his inability to control his actions and impulses as evidenced by his parole violations, and his *224 inability to control his impulses despite repeated incarceration and arrest. He thus demonstrated that he had difficulty realizing the consequences of his actions and was likely to continue the same dangerous behavioral patterns. She also noted in her report that Marentez had not had any sex offender treatment and thus manifested little understanding of his offense motivations, did not realize the cycle of offense or risk factors, had no pro-social ways of meeting his underlying needs, and had no positive way of containing or expressing his feelings. She noted that the risk of reoffense is between 30 percent and 100 percent lower for offenders who had completed appropriate treatment.
In an "Addendum Report" dated April 30, 2000, Dr. Glen incorporated her prior report, including her interview with Marentez, and her testing and record review. The reason for the "Addendum" was that, in addition to all the information she previously utilized and referred to in her previous report, a new instrument had been developed to assess risk of sexual reoffense based on several empirically determined variables. The new actuarial scale or instrument was designated as the Static-99. Dr. Glen noted in the "Addendum" that her conclusion that Marentez was likely to engage in sexually violent predatory criminal behavior was "unchanged" since her last report. She expressly noted in the "Addendum" that her "clinical" opinion was that Marentez was likely to commit a new sexually violent crime without custody and treatment. She stated that the purpose of the "Addendum" was to assess Marentez's degree of dangerousness as predicted by the new Static-99.
In the "Addendum," Dr. Glen explained that the Static-99 assesses variables that include the number of prior sex offenses, prior convictions for "non-sexual" crimes, prior sentences, selection of male victims, selection of stranger victims, the age of the person at scheduled date of release, the lifetime marital status of the person, and whether the person committed any "non-sexual violence" during the most recent sex offense. She explained that the Static-99 cannot evaluate undetected sex crimes and must rely only on detected offenses for its measurements of risk. The authors of the instrument, therefore, have calculated certain percentages of risk based on scoring of the instrument that reflect the minimum potential for reoffense, and obviously would be higher if there were any additional known sex crimes. In Marentez's case, he scored 6 on the scale, which translates to a minimum reoffense risk of 52 percent within the next 15 years.
Dr. Glen noted in her "Addendum" that additional variables must be considered before making a final prediction of dangerousness. These variables include deviant sexual preferences such as pedophilia, and compulsions such as sexual promiscuousness, both of which were manifested by Marentez. Prior non-sexual offenses must be examined because they increase the risk of sexual reoffense, and Marentez had a record of non-sexual crimes. A negative relationship with one's mother increases the risk of reoffense. Participation in sexual offender treatment programs can lower the risk of reoffense, and a lack of treatment can increase the risk. An antisocial lifestyle reflected in a criminal record can indicate an increased risk of reoffense. A history of noncooperation with supervision, such as Marentez's absconding from and violating parole, indicates an increased potential for reoffense. There is a positive correlation between substance abuse and future sexual offenses because inhibitions and judgment can be affected, and Marentez admitted he used drugs and was under the influence when he assaulted the three-year-old boy in the church. A diagnosis of psychopathy increases the risk of reoffense, and Marentez had many traits and coping styles indicative of psychopathy, although he did not meet the full criteria for such a diagnosis. Separation from a parent prior to age 16 increases the risk of sexual reoffense, and Marentez was raised *225 by his grandparents rather than his parents throughout much of his childhood. Based on her examination of these variables, in addition to the score of 6 on the Static-99 instrument, Dr. Glen found that Marentez was at a "high" risk for committing a future sexual assault. She specifically stated in the "Addendum" that this opinion was based on a myriad of factors, including "actuarial, diagnostic, behavioral and testing data."
In her testimony at the probable cause hearing, Dr. Glen noted that Marentez had told several different stories to different people about the same incidents and was "obviously lying to someone," and she believed that it would be a mistake for a psychological evaluator to rely on self-reporting by Marentez in assessing the risk of reoffense.[10] She also believed that it was a mistake for a psychological evaluation of future risk of reoffense to be based on a penile sizmograph test, since the person being tested can distract themselves to repress sexual feelings and responses and create false negatives. She believed that the penile sizmograph had a place in treatment, but not in assessing risk as a diagnostic tool, unless reliance was placed on positive responses, which were more meaningful than negative responses which could be false.[11]
She had reviewed a "relapse prevention plan" for Marentez, but she believed that he did not have the skills necessary to restrain himself from reoffending. She did not view Marentez as being totally a "preferential" child sexual offender or totally a "situational" child sexual offender. She believed that people are not totally one or the other, and that it is more like a "continuum." She found Marentez had a sexual orientation toward children that was not just "situational." When pressed to place him in one category or another, she testified that in her opinion he was a "preferential" child molester based on his behavior in molesting a child in church after luring him to a bathroom with a promise of candy, molesting a boy in a YMCA shower, and molesting a girl in the back of a shoe store after luring her there with a promise of free shoes. She also found that Marentez had pedophilia tendencies and urges independent of drug use, that become more dangerous when he used drugs because of lowered inhibitions caused by drug use. She did not believe that his pedophilia urges were because of his drug use, or else every drug user would have such urges and that was not the case.[12] She believed that the fact there was a time period of six years between the 1988 and 1994 offense was not significant in determining whether or not Marentez suffered from pedophilia, since many child molesters do not reoffend at all or do not reoffend for periods as long as 10 years.[13]
Dr. Glen testified that in her opinion Marentez was more likely than not to reoffend because his history indicates he cannot control his behavior. She testified that she based her opinion that he was likely to reoffend on his history of reoffending despite the consequences, the diagnosis of pedophilia, the fact that he had not developed any of the tools necessary to help him control his urges when they became *226 strong, and the fact that the psychological tests indicated he was a self-centered and compulsive person who would tend to act out on his urges. She testified that when the predictor instruments (actuarial scales such as the Static-99) are used, Marentez "comes out over [a] 50 percent" risk of reoffending. She also testified that "when you start looking at all of the other risk factors" he is well over 50 percent and is not a "marginal" case.
Dr. Glen testified that the Static-99 is a "screening" instrument and that you have to look at other variables to come up with an accurate prediction. She said that "[i]f all you're looking at is one screening instrument and you looked at nothing else about him, I think that might be problematic, but that's not how this instrument has been used [by me]." She testified that the Static-99 meets the threshold standard for having predictive validity as a screening instrument, and is the best predictive instrument that can be used.
Dr. Glen testified that the maximum score on the Static-99 is a 12, and that Marentez scored a 6. Anytime a person scores a 6 or over he or she is considered "high risk" and it does not matter what the particular score is if it is 6 or over. For that reason, the tables for the Static-99 do not go over a 6. She testified that the predictive accuracy of the Static-99 is 71 percent. She testified that the Static-99 uses ten factors to calculate a score. She used additional factors not included in the ten Static-99 factors to adjust the score in making her prediction of his future dangerousness, including factors such as a deviant sexual preference and a negative relationship with his mother.
Dr. Glen testified that Marentez was "strong" on all of the predictive factors and "fit[ ] in very well with what I know clinically." She testified that, "I didn't rely on clinical judgment in this case." She subsequently noted that "my clinical judgment is there." She also testified she did not have to "go outside of any sort of actuarial data and just completely rely on clinical judgments" to form her opinion in this case because the actuarial data was "strong."

B. The Report and Testimony of Jack Vognsen, Ph.D.

Dr. Vognsen is a licensed psychologist who has a specialty in psychological testing and assessment and has a private practice in San Francisco. Dr. Vognsen prepared two sexually violent predator evaluation reports on Marentez. One report was dated July 10, 1998 and the other report was an "Addendum" dated July 10, 2000.
In the first report, dated July 10, 1998, he noted Marentez had been convicted of two sexually violent predatory offenses against two or more victims under the age of 14, referring to the incident with the three-year-old boy in the church bathroom, and the incident that occurred with the six-year-old boy in the shower at the YMCA. He noted that the six-year-old boy was the son of the woman Marentez was living with, and that he was violating a term of his parole by associating with the child. He reviewed Marentez's history of nonsexual crimes, his violations of parole, and his incarcerations. He also discussed the incident with the five-year-old girl that occurred at the shoe store.
Dr. Vognsen reported that he interviewed Marentez and that Marentez told him, "`I need no therapy, no psychologist or psychiatrist. . . . I can confront myself. I have analyzed myself. I have my reasons to change. . . .'" Marentez blamed the probation officer for derailing his life and persecuting him after his conviction in 1988 for child molestation. Marentez explained to Dr. Vognsen that he involved himself with his girlfriend's son (who he was convicted of molesting at the YMCA) because he wanted to prove to the courts that he could be around children without molesting them. When asked about a battery arrest in 1993, Marentez told Dr. Vognsen that, "`[I]f I beat the old man, *227 alcohol did it, not me.'" Marentez did admit, "`I'm told I have a violent streak.'"
Marentez described a long standing pattern of drug abuse, including LSD, mescaline, peyote, speed, angel dust, and marijuana. The drug he most abused was cocaine in the form of rock cocaine. He told Dr. Vognsen that he has no interest in drug counseling and never sought counseling in prison. He said, "`My drug use never was a problem. I controlled it. I am my only rehab.'" Dr. Vognsen was aware that Marentez tested positive for cocaine on four occasions while he was released on parole between 1991 and 1994.
Marentez did not admit to any of the three molestations he was arrested for, including the two he was convicted of. Dr. Vognsen, however, was aware that Marentez had previously admitted the molestation in the shoe store in 1980 to a detective investigating the 1988 offense. At the end of the interview, Marentez said to Dr. Vognsen, "`If I did any of the three sex crimes, I've done a lot of self-analysis. . . . In here we hear about violent child molesters. It scares me if I was to let that feeling control me. I could have been violent like Polly Klaas's murderer. I love my children. I'm glad it was nothing serious, violent. I can stop it, like drugs, now I have a reason to stop.'" When asked what the reason to stop was, Marentez told Dr. Vognsen that if he ever came back to prison it would be for life as a Three Strikes defendant.
Dr. Vognsen gave Marentez a Rorschach Inkblot Test and observed that Marentez exhibited faulty logic in his thinking. Marentez combined ideas in an odd, peculiar and illogical way that could lead him to reach bad conclusions and engage in ill-considered behavior. The PCL-R was also administered and Marentez scored a 31, which is significantly psychopathic and places him in the "severe" range and in the 82nd percentile of all prison inmates. His score on the first factor which measures aggressive narcissistic personality style placed him in the 92nd percentile of all prison inmates. Personality traits that cause such a high score include a lack of remorse, a callous lack of empathy, promiscuous sexual behavior, irresponsibility, and failure to accept responsibility for his actions.
Based on his analysis of Marentez, Dr. Vognsen diagnosed him as having various mental disorders, including polysubstance abuse and dependence, nonexclusive (males and females) pedophilia, and antisocial personality disorder with narcissistic traits. He also found that the overwhelming majority of the evidence indicates it is likely that he will reoffend in a sexual manner.
Dr. Vognsen noted that on the empirically-based RRASOR, the reoffense risk for Marentez was 36.9 percent over a 10-year period. Dr. Vognsen pointed out that the RRASOR does not take into account many important risk factors and only covers a 10 year period. He noted that Marentez displays many of the risk factors that are not included in the RRASOR scale. He found that Marentez had many more risk factors than are found in the case of an average extrafamilial child molester. He also noted that many molesters reoffend considerably after the 10-year limit of the RRASOR. In Dr. Vognsen's opinion, Marentez was likely to reoffend in a sexual manner.
In an "Addendum" dated July 10, 2000, Dr. Vognsen incorporated his original report and noted that his opinion remained unchanged. He stated that his conclusion that Marentez will reoffend was supported by a new actuarial risk assessment instrument known as the Static-99. He determined that Marentez falls into the highrisk category on that instrument, indicating a 52 percent likelihood of sexual recidivism within 15 years. He concluded by stating that "it is still my opinion that [Marentez] does meet the criteria as a Sexually Violent Predator. . . ."
In his testimony at the probable cause hearing, Dr. Vognsen stated that he found *228 Marentez to be a situationally-mediated offender as opposed to a preferentially mediated offender. He believes Marentez's pedophilia is an "enduring disposition" but that his "primary" sexual orientation is not toward children. He stated that in the right circumstances Marentez finds children arousing and that he acts upon those "arousals." He characterized Marentez as a "non-exclusive pedophile." He believes that Marentez can be aroused by children, and pointed out that in the incident involving the six-year-old boy in the YMCA Marentez had an erection. In his opinion it would be difficult to have an erection without having an urge.
Dr. Vognsen testified that Marentez is unable to currently control his behavior relating to his urges toward children. He based this opinion on his behavior in the past where he was unable to control himself. He noted that Marentez violated parole conditions by being around children, by committing offenses involving the use of drugs, and by committing a number of other violations.
In Dr. Vognsen's opinion, Marentez is more likely to reoffend than not, and the percentages are somewhere between 52 to 57 percent in favor of reoffense. The percentages will increase if Marentez resumes his level of drug abuse upon release. Dr. Vognsen derived the percentages by using the Static-99, which provided a percentage of 52 percent, plus 5 percentage points based on other "clinical" factors or "subjective" risk indicators not included in the Static-99, such as the amount of sexual deviancy demonstrated, the degree of antisocial behavior displayed, and the degree of cooperation with supervision that has occurred. He found the incident with a three-year-old constituted "quite" a deviant act. He also found Marentez had a long history of antisocial living. He also found that he had been uncooperative with supervision while outside of prison. On the basis of these additional subjective clinical factors, Dr. Vognsen adjusted the score upward to reach a level of 57 percent. He characterized the process as utilizing the Static-99 actuarial instrument and adjusting with "[a] dash of clinical judgment." Dr. Vognsen also testified that he looked at Marentez not just as "numbers and statistics," but as an individual, by considering "dynamic" and clinical factors. He testified that he used his clinical judgment based on his experience as a psychologist to assess Marentez's current condition.
Additionally, Dr. Vognsen testified that the risk of "reoffense" predicted by the Static-99 is not just the risk of Marentez engaging in undetected sexual offense, but the risk of his actually being charged or convicted based on detectable offenses. In that sense, the 52 percent chance of reoffense predicted by the Static-99 is very conservative.
In Dr. Vognsen's clinical opinion, people tend to behave in patterns, and if a person has offended in a particular way he or she is more likely to reoffend in the same way. Studies demonstrate that about 75 percent of sex offenders reoffend in the same way.

3. The Evidence Presented at the Probable Cause Hearing by Marentez

A. The Report and Testimony of Rebecca L. Crandall, M.D.

Dr. Crandall is a psychiatrist currently in private practice in Brentwood. She has received no training from the Department of Mental Health relating to evaluating a person as a sexually violent predator, but she has read the studies the Department uses. She has never applied the Static-99 or the RRASOR instrument. She does not do assessments of sexual offenders, but rather provides treatment. She has never had any training in the use of actuarial tools in this area, and relied mainly on psychiatric diagnosis to assess whether Marentez would reoffend.
Dr. Crandall prepared a report on Marentez dated May 19, 2000. In the report she noted that Marentez had two convictions for child molestation and that one of *229 the offenses occurred after he had previously been incarcerated. She reported that he continues to deny responsibility for his crimes, and that he has not displayed any insight into his crimes. She found that he returned to drug use when he was released into the community. She reported that there were inconsistencies between his current versions of the offenses and previous statements he made to police. She then concluded, "However, despite these factors, there is no available evidence that he currently displays fantasies, symptoms, urges, or behaviors that meet the criteria for a mental illness that would predispose him to the commission of sexual acts. Thus, there is insufficient data at this time to conclude that he meets the criteria of [Welfare and Institutions Code section 6600] as a sexually violent predator." Specifically, she found that Marentez did not suffer from pedophilia, and noted that one offense occurred while he was using cocaine, he denied committing the other offenses, and he denied having fantasies about children or urges toward children. She found his offenses with children were caused by "passive proximity" to children and drug use.
During her testimony at the probable cause hearing, Dr. Crandall was asked if Marentez would be likely to reoffend if he were released into the community. She testified that she "didn't really go so much into that actual area in my evaluation because I stopped earlier than that in terms of making that kind of determination." She was asked if she could make that kind of a determination currently and she replied that she did not currently have an opinion on that subject. She testified that her expertise is not actuarial and she usually does not even attempt to make that kind of determination in her evaluations.
She reiterated her opinion that Marentez does not suffer from pedophilia. In forming this opinion she relied in large part on Marentez's denials that he had any fantasies or urges about children. She acknowledged that Marentez could have been untruthful when he made the denials. She testified that his conduct in orally copulating the three-year-old boy in 1988 "could" be evidence of a sexual urge toward a child, but she said that it "could also mean" that he was influenced by cocaine and was "very sexual" and "had an adult come into the bathroom, perhaps he would have tried to do that with the adult." She acknowledged that his conduct in the 1994 offense that occurred in the shower with the six-year-old boy at the YMCA while he was on parole could mean he cannot control his impulses, but said that it could also be viewed as "just . . . poor judgment." When asked if she could form an opinion on whether Marentez has sufficient tools to control himself around children, she replied that, "When you say control himself around children, I'm not exactly sure what you're asking me."

B. The Report and Testimony of William Vicary, M.D.

Dr. Vicary is a psychiatrist who prepared a written report on Marentez dated September 22, 1999. In that report he noted in detail the allegations in the police report of the incident that led to Marentez's arrest in 1980 for luring a five-yearold girl into the back of a shoe store with a promise of free shoes and then molesting her. He also listed in detail the facts contained in the police report concerning the incident in 1988 when Marentez lured a three-year-old boy into a bathroom at a church by offering him candy and then orally copulated the boy and asked the boy to orally copulate him. He then listed in detail the facts contained in the police report concerning the incident in 1994 in which Marentez touched the penis of the six-year-old boy in the shower at the YMCA and then had the boy touch Marentez's erect penis.
In preparing his report, Dr. Vicary conducted an interview with Marentez. In the interview, Marentez discussed his background and criminal record. In the interview, he stated that his parole officer *230 "seemed to have it in for him" and "allow[ed]" him to violate parole without placing him in a drug program. He stated that he wanted to file a civil suit against his parole officer when he is released. Marentez told Dr. Vicary that he believed his chance of reoffending was "about ten percent." Dr. Vicary reported that Marentez expressed remorse for the harm he caused his victims, but "he did not believe that they had been seriously injured or psychologically damaged."
Dr. Vicary gave Marentez a PCL-R test and his total score was 28, which placed him at the 67th percentile of all prison inmates. His score on the first factor, which includes traits such as pathological lying, lack of remorse, and failure to accept responsibility for his own actions, was 13, which placed him at the 86th percentile of all prison inmates. His score on the second factor, which includes antisocial traits such as need for stimulation, parasitic lifestyle, and impulsivity, was 11, which placed him at the 42nd percentile of all inmates. A total score over 30 is correlated with an increased likelihood of future violent offenses.
Dr. Vicary found Marentez had diagnosed mental disorders of (1) non-exclusive pedophilia and was attracted to both male and female children, (2) polysubstance dependence, and (3) antisocial personality disorder. He found that Marentez's pedophilia "directly predisposes him to illicit sexual activity with children" and that "[h]is substance abuse impairs his judgment and impulse control." He further found that his antisocial personality disorder "makes it more likely that he will contravene social prohibitions and laws in general, including those against sexual activity with children." Dr. Vicary then utilized the RRASOR actuarial instrument supplemented with additional static and dynamic risk factors. He found that Marentez had a risk of reoffending in the next 10 years of 37 percent based on a score of 3 on the RRASOR.
Dr. Vicary ultimately concluded in his report that "[t]his is a relatively close case and reasonable experts could arrive at different conclusions. The inmate will always represent a future risk for antisocial behavior, substance abuse, and pedophilic activity. On balance, however, there would appear to be insufficient evidence to conclude that he represents a more likely than not risk of sexually reoffending in the future."
In his testimony at the probable cause hearing, Dr. Vicary stated that one static risk factor he examined in supplementing or adjusting the RRASOR was an absence of deviant sexual attitudes, which indicated a lesser likelihood of reoffense. He based this on the lack of any statements by Marentez that he believed it was acceptable to have sex with children or that he fantasizes about children on a regular basis. Dr. Vicary did acknowledge that Marentez's behavior toward children "could" or "couldn't" be an indication of a deviant sexual attitude. He admitted it is less reliable to assess whether Marentez has deviant sexual attitudes based on his statements as opposed to his behavior. Other "pro-social" factors include his marriage of 10 years, his two children, and his employment history. Dr. Vicary admitted that while Marentez was engaged in these "prosocial" activities, he nevertheless molested children. Dr. Vicary believed that Marentez's drug use directly or indirectly contributed to the child molestations, but he found that it was Marentez's pedophilia that was the major factor in the molestations.
Dr. Vicary scored Marentez on the Static-99 actuarial instrument and calculated a score of 6, which he said "does make this, I believe, a tougher case" in which to find that Marentez was not likely to reoffend. He noted that the score of 6 was the highest score possible on the Static-99. Dr. Vicary acknowledged that when he wrote in his report dated September 22, 1999, that it was a "close case" as to whether Marentez was more likely than *231 not to reoffend, he had only used only the RRASOR test that produced a predictive rate of 37 percent chance of reoffense over 10 years, and had not yet used the Static-99. The fact that the Static-99 produced a 52 percent chance of reoffense over 15 years "makes it a closer case," but did not "push it" into the more likely than not category. He testified that "[i]t's possible that it could push you over," but that although it predicted a 52 percent chance of reoffense over 15 years, Marentez would be older and the chance of antisocial behavior was decreasing over the years. He admitted that even at age 57, Marentez would still have "a significant risk of reoffending." He noted, "I think it's a close case" but maintained his opinion that the risk of reoffense was not "push[ed] over" to more likely than not. He acknowledged that, "I could be very well wrong on that."
Dr. Vicary testified that the Static-99 was valid and reliable, but that you had to look at other factors to adjust the score. He looked at other factors and adjusted the percentage of reoffense risk downward. He based this on factors such as Marentez's fear of the Three Strikes law, his increasing age, and the impulsiveness of his past offenses, which indicated an "acting out" caused by a dysfunctional family background and long term drug and alcohol abuse. He acknowledged that the impulsiveness of the offenses was a "double-edged sword" that could make him more dangerous, and that if he cannot control his impulsiveness he is likely to keep committing pedophilic offenses. He also acknowledged that pedophiles reoffend into their 60's, 70's, and even into their 80's.
He testified he was "concern[ed]" that Marentez had reoffended even after being incarcerated, and that, "I am worried about Mr. Marentez." He noted that Marentez "will always be at risk for re-offending" and that "[h]e will always represent a significant risk of sexually re-offending." He said the score of 28 he gave Marentez on the PCL-R test was "very close" to the level of a psychopath. The fact that he scored so high on the first factor in the PCL-R test indicates to Dr. Vicary that Marentez has psychopathic character traits, and such traits are a factor that points to a likelihood of reoffense. Such a high score on the first factor indicates to Dr. Vicary that Marentez's crimes are more related to his antisocial personality disorder than to his drug use.

C. The Report and Testimony of Raymond E. Anderson, Ph.D.

Dr. Anderson is a Psychologist who is the President of Pacific Professional Associates in Los Angeles, which was formed to promote psychological research in the field of forensic psychology, and which includes a Sex Offender Treatment and Assessment Program that has a goal of reducing recidivism among sex offenders.
Dr. Anderson prepared a written report on Marentez dated March 7, 2000. In that report he noted that the 1994 and 1988 offenses qualified as prior sexually violent offenses because of the age of the victims. He believed, however that a diagnosis of pedophilia "cannot be defended" because each of the prior child molestation offenses constituted "one-time events" and because Marentez was not "presently experiencing strong urges to involve himself sexually with children." He also found that a diagnosis of Antisocial Personality Disorder was not justified, although he acknowledged that "[t]here are some traits in this man that certainly suggest this disorder." His impression was that Marentez was "a situational child sexual abuser." He found that Marentez molested children not from "strong inner urges" but rather due to a loss of control and "lack of restraint in conducive situations." He concluded that there is little doubt Marentez posed a greater threat to children than the typical non-offender, but found that the threat he posed was not close to 50 percent. In preparing the report Dr. Anderson conducted an interview with Marentez in which Marentez denied any strong and *232 persistent urges to involve himself sexually with children.
In his written report, Dr. Anderson noted that Marentez had developed a scattered and unclear set of core values and lacked persistent direction. He found that Marentez developed adaptive social perception assumptions about his social world and felt he had to prove himself. He noted that Marentez now has a positive view of himself that is "accurate." He further noted that Marentez had a blurred and unreliable perception of personal boundaries in the past, but that they now appeared to be "adequate." He also found that Marentez was capable of adopting a "new approach." He noted that Marentez "may brush over some requirements but, when he understands a situation clearly, he respects the rights of others and is humanistically inclined." He recognized that Marentez had a clear tendency toward "control" and "`putting his best foot forward.'" He determined that Marentez was adhering to conventional middle-class values.
Dr. Anderson reported that "various specialized sexual inventory measures" that were administered to Marentez indicated he was "similar to situational child sexual abusers rather than Pedophiles." Dr. Anderson believed that Marentez's responses on the "Cognition Scale" were "those of a sexually normal male" and his clinical impression was that Marentez did not suffer from any pathological distortions held by preference based pedophiles. He did note, however, that Marentez's scoring on the Child Molester Empathy Scale "reflected average empathy for children but shows a differential empathy for his own victims similar to that seen in untreated child sexual abusers."
Dr. Anderson distinguished between preferential child sexual abusers and situational child sexual abusers, and noted that preferential abusers were more dangerous. He found that Marentez's offenses resulted from "a failure of control rather than from strong internal direction." He believed that this "situational" status decreased the likelihood of reoffense, but added a comment in the report that "[h]opefully, his control has improved." He acknowledged in the report that situational offenders sometimes also reoffend.
Dr. Anderson included in his report a section dealing with the use of actuarial or statistical predictors, and noted that there were problems associated with them. He pointed out that the prediction includes any sexual reoffense and not just "violent" offenses. He noted that there was some "overlap" among the various predictors. He noted that the accuracy rate of the Static-99 was .71 and said one is "more accustomed" to seeing values of .85 or .90 in clinically useful tests.
In his testimony at the probable cause hearing, Dr. Anderson reiterated his opinion that a diagnosis of pedophilia could not be defended because there was no continuing course of conduct, one of the offenses occurred while Marentez was under the influence of drugs, Marentez was not functioning in a way similar to preferential child sexual abusers, and because Marentez denied he ever had any strong urges to molest children. He initially testified that, in his opinion, the nature of the offenses does not even imply that Marentez had any sexual urges toward children to the degree required for pedophilia. On cross-examination, though, he testified that Marentez "must have had [sexual desire for children] on the instances of these offenses. If there wasn't some appeal, then he probably wouldn't have carried out these offenses." When asked if it was primarily just a "loss of control" and being in a "conducive situation[ ]" that led to the offenses with the children, why these same factors did not also lead to sexual offenses with adults, Dr. Anderson replied, "Well, because the adults with whom he had sex didn't complain, or there was consent." He was aware that Drs. Vicary, Vognsen and Glen had all diagnosed Marentez as suffering from non-exclusive pedophilia, *233 but he still believed that such a diagnosis "cannot be defended."
He believed that an important part of Marentez's prior offenses was drug abuse. However, he testified that he did not know of any drug usage during the 1980 incident at the shoe store and could not remember "enough details" about the 1994 incident in the shower at the YMCA to "say for sure" that he was using drugs at that time.
Dr. Anderson testified that he believed Marentez now understood his behavior was harmful to children, that the "relapse prevention plan" devised by Marentez reflected restraint and perspective, and that his increasing age would diminish his sexual drive. He admitted that one of Marentez's motivations for telling him he was willing to cooperate with the relapse prevention plan and with parole and treatment could be because he wanted to get out of custody. He acknowledged that child molesters continue molesting into advanced ages.
He did not believe the criticism that his evaluation depended on the truthfulness of Marentez was a valid criticism, and he said he found Marentez was average in terms of his "defensiveness." He did not believe the evidence from the prior offenses was strong enough to infer that he was lying about his lack of sexual urges toward children. He did acknowledge that "[m]aybe he wouldn't tell me" about his "urges and fantasies about children." He also testified that he scored Marentez on the PCLR test and the score was a 24, which was on the "high side."
Dr. Anderson noted the Static-99 had no known "base rate" and instead a Receiving Operator Characteristic Curve (ROC) was used to assess the accuracy of the Static-99. He considered the Static-99 to be a "step in the right direction," and noted it was in its "infancy." In his opinion the Static-99 would be valid as applied to Marentez.
He agreed that the Static-99 was the "best . . . actuarial tool" available to assess whether a person is going to sexually reoffend. In his opinion, each of the individual factors used in the Static-99 had weak correlations to recidivism when examined separately. He also criticized the fact that some of the "predictors" overlapped. However, he admitted on cross-examination that "overlapping" occurs on a lot of instruments and testing devices, and that it was common to use a related type item as long as it added something new to the assessment. He testified that ordinarily such overlapping is "fine."
He admitted that he is not an expert in statistics and mathematics and would not put himself in the class of somebody like Dr. Hanson, who created the Static-99. He testified that the ROC used to determine the accuracy of the Static-99 was simply a statistic that was used to determine the relationship between the level of prediction and a score on a certain variable. He testified that it was a statistic that was "used a lot" in medicine and other fields, but was not something that psychologists were accustomed to using in psychology. He stated that Dr. Hanson used that statistic on the Static-99 because "it gets around the problem of base rate." He noted that it was complicated to translate it into English and the difficulty of understanding it made it "impractical" in court. He noted it was used in medicine to predict side effects of drugs and was a very popular statistic. He also noted it was used in the field of communications. In those fields, an ROC of .85 to .95 was clinically useful, but in those fields they insist on more precision. In psychology an ROC of .71 is something that psychologists "should pay attention to and use but [use] appropriately."
He acknowledged that he had received no training on using the Static-99 and did not score Marentez on it. He also did not score Marentez on the RRASOR or on any other actuarial instrument available. He did not score Marentez on these instruments because he had no reason to think that Drs. Glen, Vognsen or Vicary had *234 incorrectly scored them, including when they calculated the highest score of 6 on the Static-99.
Dr. Anderson testified that he did not know exactly what Marentez's level of reoffense risk was. His reasoning is simply that there is no reason to believe he is more likely than not to reoffend, and since he cannot prove that he is "more likely" to reoffend he thinks he is "probably less likely" to reoffend. He was asked if he would consider Marentez to be in denial if he was treating him as a patient, and he replied, "Well, I wouldn't have an opinion as a psychologist."

4. The Ruling of the Court at the Probable Cause Hearing[14]
The trial court informed counsel prior to making its ruling that it "doesn't really know what [its] role is" at the probable cause hearing and invited the attorneys to seek appellate review following the hearing so that an appellate opinion could be obtained "that tells us what it is we are supposed to do." The trial court stated it believed it was "the trier of fact" and was "obligated" to resolve conflicts in the expert testimony at the probable cause hearing. In this regard, it noted that it had to decide which expert it "believe[d]" based on its examination of the "underlying reason[s]" for the opinions expressed by the experts.
Counsel for petitioner pointed out that the ultimate trier of fact was the jury at the trial stage and that a mere difference of opinion did not require resolution at the probable cause stage if the opinions of the experts called by petitioner were supported by sufficient evidence and, in conjunction with all the other evidence presented, reached the level of probable cause to believe that Marentez was likely to engage in sexually violent predatory criminal behavior upon release. Counsel acknowledged that the court could decide matters of credibility to determine if a witness qualified as an expert and to aid it in its determination of whether the basis of the expert opinion was legally and factually sufficient. Counsel argued, however, that it was not for the court at the probable cause hearing to decide which expert it personally believed had the more persuasive opinion, but that the court rather should apply a reasonable person standard and decide if a reasonable person hearing the evidence and opinions could have a strong suspicion of the truth of the allegation that Marentez was likely to engage in sexually violent predatory criminal behavior upon release.
The trial court rejected this argument that a reasonable juror should be allowed the opportunity to resolve conflicts in testimony between experts as long as there was a reasonable basis for the opinion of each expert. The trial court specifically stated that the expert testimony was "highly specialized" and was "in an area in which lay jurors are probably more challenged than the probable cause judge." The court stated it had an obligation to "sort it all out" at the probable cause stage. The trial court explained it had to resolve all conflicts in expert testimony and assess the believability of the expert *235 opinions based on their underlying basis at the probable cause stage because lay jurors were not likely to be fair or dispassionate at the trial stage. The trial court expressly stated, "How is a jury supposed to understand this evidence and how is a jury supposed to remain neutral when the very words `sexual' `violent' and `predator' are spoken of as though those words aren't so emotionally charged that a jury is going to be able to look at the evidence fairly and dispassionately? That's another reason why the probable cause judge plays such a crucial role in deciding which cases should go [to trial] and which should not."
In assessing the "underlying reason[s]" for the opinions rendered by petitioner's experts, the trial court made clear numerous times throughout the hearing that it believed that an actuarial instrument could not be relied upon by the experts at a probable cause hearing unless it was shown that predictions of future dangerousness based on such an instrument reached the level of reasonable "certainty," and that actuarial evidence that does not predict the likelihood of recidivistic conduct with reasonable "certainty" was "worthless for purposes of establishing probable cause." In making its final ruling, the trial court expressly found the actuarial instrument relied upon by petitioner's experts, the Static-99 instrument, was "not reliable enough according to accepted scientific principles" to be used to establish that Marentez was more likely than not to commit a sexually violent offense. The trial court further ruled that using statistical probability such as that necessarily involved in an actuarial approach to deprive someone of a liberty interest by making predictions of future dangerousness was an unconstitutional violation of due process in a civil proceeding under the Sexually Violent Predators Act where the ultimate standard of proof at the trial stage was "beyond a reasonable doubt."
The trial court also made a factual finding based on its assessment of Dr. Glen's testimony that Dr. Glen did not utilize clinical factors to "adjust" the actuarial instrument in order to support her conclusion that Marentez was likely to reoffend if released. The court therefore rejected her opinion since it lacked the required adjustment with clinical factors. As to the testimony of Dr. Vognsen, the trial court found as a factual matter that Dr. Vognsen did use clinical judgment to adjust the score, but said it was nevertheless rejecting his opinion since he relied on the Static-99, which the court found "isn't good enough" due to its belief that the Static-99 was unreliable and hence inadmissible.
The trial court expressly stated in making its ruling that it was using a reasonable cause standard, it was taking into account its view of the demeanor of the witnesses and the "certainty with which they had command of the underlying information upon which they based the decision," and on other "credibility" factors. It noted it found the testimony of Dr. Anderson to be more persuasive because he had more experience in administering psychological tests and because his testimony was "carefully thought out and considered" as opposed to the witnesses for petitioner. It stated it also believed the testimony of Dr. Vicary.
The trial court then stated it was a close case, but that the evidence presented at the hearing did not support a reasonable belief that Marentez "is more likely than not to reoffend in a sexually violent manner...."[15] The court therefore found the petition not true and the petition was dismissed.

*236 DISCUSSION

The Role of the Judge at the Probable Cause Hearing Relating to the Resolution of Conflicting Expert Opinions
In this case, the trial court expressed a desire for appellate guidance on its role or function at the probable cause hearing relating to whether it was "obligated" to and had to resolve conflicts between experts and determine which experts it personally believed were most persuasive on issues such as whether Marentez was likely to reoffend. We simply note that the issue at the probable cause hearing is not which expert opinion the judge personally finds most persuasive, but rather it is whether a reasonable person hearing all the evidence could have a strong suspicion of the truth of the allegation in the petition. Such a reasonable person could easily have an impression of the evidence different from that personally held by the trial court, and it is the reasonable person's state of mind that must prevail. Thus, the judge at the probable cause hearing must not rule based on a personal opinion, and must not personally determine the ultimate issue based on its own opinion of the "persuasiveness" of an expert witness who has a reasonable basis for his or her opinion and is not determined to be untruthful. The ultimate resolution of conflicts in the expert opinion should be left to the jury at the trial stage if the court finds the witnesses at the probable cause hearing are truthful, have legally sufficient support for their conflicting opinions, and a reasonable person could credit the evidence in favor of future dangerousness. The court at the probable cause hearing can, of course, determine the credibility of witnesses to determine if they are lying or mistaken about the facts they rely on, or whether there is a sufficient basis for their opinions, but the probable cause judge must not substitute his or her personal assessment of the strength of the case for the reasonable person standard that is applicable to such hearings. (People v. Slaughter, supra, 35 Cal.3d at pp. 637-638, 200 Cal.Rptr. 448, 677 P.2d 854.)

Standard of Review
When a judge or magistrate at a probable cause preliminary hearing in a criminal case finds that no probable cause has been established to justify holding a trial in the matter, a court reviewing the order of dismissal ordinarily applies a substantial evidence test to findings of fact, and those findings are conclusive if supported by substantial evidence. (People v. Slaughter, supra, 35 Cal.3d at pp. 638-641, 200 Cal.Rptr. 448, 677 P.2d 854.) If the judge or magistrate does not render such conclusive factual findings, the decision to dismiss is erroneous as a matter of law if the evidentiary record discloses a rational basis for believing the allegations underlying the probable cause hearing are true. (Id. at pp. 638-642, 200 Cal.Rptr. 448, 677 P.2d 854.)
It is clear, moreover, that a decision that an expert opinion is based on legally insufficient grounds is not a conclusive factual finding that is subject to the substantial evidence test, since such a finding is purely a legal ruling and should be reviewed for legal correctness under an abuse of discretion standard. (Korsak v. Atlas Hotels, Inc. (1992) 2 Cal.App.4th 1516, 1523, 3 Cal.Rptr.2d 833 [reviewing court noted that (1) while a trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is based, the discretion to admit or exclude evidence is not unlimited but rather is a legal discretion which is subject to the limitations of applicable legal principles, and (2) it is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid and the proffered testimony is within the proper scope of expert testimony].)
When the judge, or magistrate at a preliminary hearing, refuses to consider evidence because he or she considers it legally inadmissible, and finds the remaining evidence to be insufficient, the determination *237 of insufficiency is a legal conclusion and not a conclusive finding of fact. The issue of sufficiency of the evidence is then reviewable as an issue of law and the reviewing court has to decide whether the evidence provides a rational basis for finding the allegations true. When the judge or magistrate expresses "disbelief" of the testimony of a witness, a conclusive factual finding has been made. (People v. Farley (1971) 19 Cal.App.3d 215, 221, 96 Cal.Rptr. 478.) Where the judge or magistrate accepts the testimony but simply reaches the ultimate conclusion that it is insufficient to provide probable cause, the conclusion is subject to challenge and appellate review of the entire record. (Ibid.)
We believe the same rules applicable to review of probable cause determinations at preliminary hearings in criminal cases should apply to review of probable cause determinations in sexually violent predator cases. (Cf. People v. Mercer (1999) 70 Cal.App.4th 463, 465-466, 82 Cal. Rptr.2d 723 [applying the same standard of review used in criminal cases following conviction to review of a commitment order under the Sexually Violent Predators Act].) We also find that general rules relating to appellate review under the abuse of discretion standard of a decision to exclude the basis of an expert's opinion on grounds of insufficiency apply to proceedings under the Sexually Violent Predators Act.
In order to utilize the appropriate standard of review in the case at bar, therefore, we must determine if the court in fact made any conclusive "factual" findings, based on witness credibility, in dismissing the petition, or if it actually rejected the expert testimony of Drs. Glen and Vognsen based on its legal conclusion that the Static-99 was unreliable and therefore inadmissible.
First, we will address the trial court's ruling that Dr. Glen did not utilize any clinical judgment in forming her opinion. The court made a factual finding based on its assessment of Dr. Glen's entire testimony, that she did not utilize any additional clinical judgment to adjust the Static-99 results and relied on the Static-99 results alone. This determination was a factual finding that is conclusive on appellate review since the court had the power to resolve any inconsistencies within the testimony of Dr. Glen. In light of this factual finding that no clinical judgment was used, the court's subsequent ruling that Dr. Glen's opinion lacked sufficient factual support was within its discretion, and must be credited by this court on review. We will therefore sustain the factual finding and the determination based on that factual finding that Dr. Glen lacked a sufficient basis for her opinion.
As to Dr. Vognsen, the trial court expressly noted that he did utilize his clinical judgment, but nevertheless found that Dr. Vognsen's opinion lacked sufficient support because he "relied" upon the Static-99, which was "not reliable enough." The court evidently accepted the testimony that Dr. Vognsen had in fact utilized the Static-99, that he had in fact found Marentez scored a 6, and that the risk of reoffense represented by a score of 6 was calculated to be 52 percent by the author of the Static-99 instrument. The court accepted all of this testimony, none of which was controverted by any other witness.[16] The court did not find that Dr. Vognsen was lying or mistaken about the fact he utilized and scored the Static-99. Rather, the court found that the Static-99 did not provide a reliable enough basis to support an expert opinion that Marentez was likely to reoffend, even when clinical factors were used to "adjust" the raw score, and on the basis of this ultimate *238 legal conclusion the court rejected the opinion of Dr. Vognsen. It is clear as to Dr. Vognsen, therefore, that the decision of the court to reject his expert opinion was based not on a failure to utilize clinical judgment to "adjust" the raw score, but rather on the inherent "unreliability" and legal inadmissibility of the Static-99. This basis for rejecting his opinion is not a conclusive factual finding but rather a legal conclusion as to the sufficiency of the basis for an expert opinion.
As we previously noted in this opinion, a decision that an expert opinion is based on legally insufficient grounds is not a conclusive factual finding, since such a finding is purely a legal ruling and should be reviewed for legal correctness under an abuse of discretion standard. (Korsak v. Atlas Hotels, Inc., supra, 2 Cal.App.4th at p. 1523, 3 Cal.Rptr.2d 833.) We must therefore determine if the court abused its discretion (1) when it found the Static-99 test had to and did not meet standards of reliability and "certainty" applicable to new "scientific principles," and (2) when it ruled that using statistical probability derived from actuarial instruments such as the Static-99 to deprive a person of a fundamental liberty interest by making predictions of future dangerousness was an unconstitutional violation of due process in a civil proceeding which was similar to a criminal proceeding because the ultimate standard of proof at the trial stage was beyond a reasonable doubt.

1. The Admissibility of the Static-99 Results as a Basis for Dr. Vognsen's Expert Opinion on Future Dangerousness

The trial court concluded that the Static-99 was "not reliable enough according to accepted scientific principles" to be utilized in court proceedings to help establish that Marentez was likely to commit a sexually violent predatory criminal offense if released. The court in effect ruled that any testimony about the use and results of the Static-99 actuarial instrument was inadmissible and could not be considered by the court at a probable cause hearing or by a jury at trial unless it was shown to be reliable under the standards for admissibility of new scientific evidence established in People v. Kelly (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 and Frye v. United States (D.C.Cir.1923) 293 F. 1013.
However, it is now settled that a psychiatrist's prediction of future dangerousness is not subject to a Kelly-Frye analysis and that it does not matter if the psychiatrist used clinical or actuarial models or even whether the psychiatrist followed the DSM published by the American Psychiatric Association, since experts are not restricted to one methodology or another in rendering predictions on future dangerousness. (People v. Ward (1999) 71 Cal. App.4th 368, 372-375, 83 Cal.Rptr.2d 828 [noting that a psychological evaluation is a learned professional "art" rather than the exact "science" with which Kelly-Frye is concerned].) In fact, such predictions are admissible even in civil commitment proceedings and criminal trials where the standard of proof is beyond a reasonable doubt. (Id. at p. 374, 83 Cal.Rptr.2d 828; People v. Stoll (1989) 49 Cal.3d 1136, 1147-1148, 1155-1161, 265 Cal.Rptr. 111, 783 P.2d 698.) In this regard, it is of no consequence if a difference of opinion exists among professionals relating to which methodology should be utilized. (People v. Ward, supra, 71 Cal.App.4th at p. 375, 83 Cal.Rptr.2d 828.) It is also of no consequence that the reliability of the instrument being right is only 70 percent according to validity or accuracy rates. (People v. Stoll, supra, 49 Cal.3d at p. 1148, 265 Cal.Rptr. 111, 783 P.2d 698 [noting evidence that the MMPI test has better than a 70 percent chance of being right and that the usual standard in psychological testing is 70 percent.].)[17]
*239 Indeed, the Supreme Court in Stoll noted that "[n]o precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior." (People v. Stoll, supra, 49 Cal.3d at p. 1154, 265 Cal.Rptr. 111, 783 P.2d 698.) The Stoll court stated that California courts have historically deferred to a qualified expert's decision to rely on standardized psychological tests to reach an opinion on a person's mental state. (Ibid.) The court distinguished between the use of new scientific procedures or devices which purport to provide definitive truth with an aura of infallibility and certainty that is undeserved and are based on techniques new to science and the law, with the use of expert psychological testimony which is commonly used in court. The court noted that, "absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to Kelly/Frye." (Id. at p. 1157, 265 Cal.Rptr. 111, 783 P.2d 698.) The court emphasized that it had never applied Kelly-Frye principles to expert medical testimony, "`even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association [citation].'" (Id. at p. 1157, 265 Cal.Rptr. 111, 783 P.2d 698.)
The Stoll court further noted that where the trier of fact is informed that the accuracy rate of the instrument used is only 70 percent and is therefore not "foolproof," and when it is made clear that the instrument has been supplemented with subjective clinical assessments such as interviews and case history, the trier of fact is sufficiently made aware that the testimony relates to "a learned professional art." rather than the purported exact science with which Kelly-Frye is concerned. (People v. Stoll, supra, 49 Cal.3d at p. 1159, 265 Cal.Rptr. 111, 783 P.2d 698, original italics.) The court found that while the expert's opinion on state of mind can be challenged by other experts and the methods utilized can be explored on cross-examination, the "test-based opinion" of the expert should be admitted into evidence. (Ibid.) The court rejected a suggestion that a jury is incapable of evaluating properly presented references to psychological "profiles," and found no danger that a jury would view a diagnosis that used such terminology as "scientific." (Id. at p. 1161, fn. 22, 265 Cal.Rptr. 111, 783 P.2d 698.)
It is therefore clear that a psychological instrument that uses an actuarial method to produce a profile of a person's likelihood of reoffense with an accuracy rate of over 70 percent, and that is supplemented or adjusted by use of clinical factors, can form the basis for an expert opinion on future dangerousness without having to satisfy Kelly-Frye standards of reliability applicable to new scientific evidence.
In the case at bar, Dr. Anderson testified that an instrument with an accuracy rate of .71 was something that psychologists *240 should pay attention to and use appropriately. He also agreed that the Static-99 was the best actuarial tool available to assess whether a person is going to sexually reoffend. Dr. Vicary testified that the Static-99 was valid and reliable, but noted that one had to look at other clinical factors to properly adjust the score. These experts, who were called by Marentez, did not question the usefulness of the Static-99; they simply testified that by itself it could not predict that one would be more likely than not to reoffend sexually with any more than 71 percent accuracy.
Dr. Vognsen testified that he used the Static-99 to achieve a base score, but he then utilized a number of other clinical or subjective factors to adjust the score. Among the clinical factors he utilized were the amount of sexual deviancy demonstrated, the degree of antisocial behavior displayed, and the degree of cooperation with supervision that has occurred. He found the incident with the three year old girl constituted "quite" a deviant act. He also found Marentez background and case history demonstrated a long history of antisocial living. He further found that Marentez had been uncooperative with supervision while out of prison. On the basis of these additional clinical factors, he adjusted the score to reach a risk level of reoffense of 57 percent, which was well over the more likely than not standard. He testified that he looked at Marentez not just as "numbers and statistics," but as an individual, by considering "dynamic" and clinical factors. He expressly noted that he used clinical judgment based on his experience as a psychologist to assess Marentez's current condition and risk of reoffense.
It is therefore clear that even if one disregards the entire testimony of Dr. Glen and not just her ultimate opinion on future dangerousness, the remaining testimony, including that of the experts called by Marentez, establishes that psychologists and psychiatrists consider the Static-99 to be valid and reliable for use in assessing mental state and as a screening device to help assess the risk of reoffense, as long as it is supplemented with other clinical factors. It is also clear that while the accuracy rate of 71 percent may not meet the certainty requirements applicable to new scientific evidence, such requirements have no application to expert psychological opinion testimony based in part on actuarial instruments. We therefore conclude that the trial court abused its discretion when it ruled that the Static-99 was not reliable enough according to accepted scientific principles to be used a basis for an expert opinion on future dangerousness, and when it rejected the testimony of Dr. Vognsen because he had utilized the Static-99 in forming his opinion.
In making its legal ruling on the inadmissibility of an expert opinion that relied on the Static-99 instrument, the trial court announced that another reason it was required to reject the use of the Static-99 was because the use of statistical probability, such as that involved in an actuarial approach, to deprive someone of a fundamental liberty interest by making predictions of future dangerousness, was an unconstitutional violation of due process in a civil proceeding under the Sexually Violent Predators Act because the ultimate standard of proof at the trial stage was "beyond a reasonable doubt." The court evidently believed that the holding of People v. Collins (1968) 68 Cal.2d 319, 331-332, 66 Cal.Rptr. 497, 438 P.2d 33, mandated such a result.
In Collins, the prosecutor in a criminal trial called as a witness a mathematician who testified without any evidentiary support that the "odds" or probability of finding the joint occurrence of mutually independent events was equal to the product of the individual probabilities that each of the mutually independent events would occur. (People v. Collins, supra, 68 Cal.2d at p. 325, 66 Cal.Rptr. 497, 438 P.2d 33.) The unrelated events included the presence of a "partly yellow car," a "m[a]n with [a] mustache[ ]," a "girl with a ponytail," a *241 "Negro [man] with a beard," and an "interracial couple" in a car. (Id. at pp. 325-326, fn. 10, 329, 331, 335, 66 Cal.Rptr. 497, 438 P.2d 33.) The application of the "product rule" produced testimony that the odds of a random couple possessing all the unrelated factors specified was 1 in 12 million. (Id. at p. 325, 66 Cal.Rptr. 497, 438 P.2d 33.) The Supreme Court in Collins found that such testimony had inherent failings that prevented its use in a criminal trial. The court noted that no evidentiary support had been offered to show the probabilities of the individual factors, and that the focus was not on the particular defendants on trial and factors applicable to them, but rather was based on a random couple and on a series of unrelated factors that may have had no application to the particular defendants. (Id. at pp. 327-332, 66 Cal.Rptr. 497, 438 P.2d 33.) The court found, moreover, that the argument of the prosecutor was to the effect that the "product rule" produced such astronomical odds that the jury should find the defendant guilty without even using the standard of beyond a reasonable doubt. (Id. at p. 332, 66 Cal.Rptr. 497, 438 P.2d 33.) The Supreme Court concluded that such testimony and argument was an improper use of mathematical techniques to prove facts at trial. (Ibid.)
Collins has no application to the instant case, where the factors relied upon were correlated through testimony with a risk of reoffense, and where the factors, such as prior convictions suffered by the alleged sexual predator, whether the actual victim chosen by the alleged predator in his prior offenses was a stranger, and whether the alleged predator had received treatment, were all related to Marentez and his personal background. Moreover, the testimony indicated the accuracy rate of the instrument was 71 percent, and the raw score produced a reoffense risk factor of 52 percent, and no effort was made to rely on astronomical "odds" to supplant the applicable standard of proof. In fact, the raw score was "adjusted" with clinical factors that once again related directly to Marentez's background and offenses, to produce an expert psychological opinion on the risk of reoffense of Marentez and not some random person.
In fact, the use of an actuarial instrument as a base that is then adjusted by the use of clinical factors such as past cooperation with supervision or parole has been approved for use in sexually violent predator cases in People v. Poe (1999) 74 Cal. App.4th 826, 830-832, 88 Cal.Rptr.2d 437, in which the experts calculated a risk of reoffense at 48.6 percent using the RRASOR actuarial instrument, and adjusted that with clinical factors to find the risk of reoffense was over 50 percent. The Poe court noted that this process was an "adjusted actuarial approach" and rejected a challenge to the validity of this approach on appeal. We note, moreover, that Poe approved this approach in the trial stage where the standard of proof was beyond a reasonable doubt, whereas the instant case only involves a probable cause hearing.
Since the trial court in the case at bar erred in determining that a risk of reoffense derived from an actuarial instrument and expressed in statistical or percentage terms could not be utilized in a sexually violent predator case because of due process concerns, we find that the ultimate rejection of Dr. Vognsen's expert opinion which was based in part on the use of the actuarial instrument constituted an abuse of discretion.

2. Sufficiency of the Evidence

Since we have determined that the trial court made a conclusive factual finding based on Dr. Glen's testimony that she did not use any clinical judgment in forming her opinion, and therefore had a basis to reject her opinion, we will only consider the testimony of Dr. Vognsen relating to his use of the Static-99, along with the other remaining evidence presented at the hearing, in order to determine if the record discloses a rational basis for believing the truth of the allegation that *242 Marentez is likely to reoffend. In assessing the evidence under this standard, it is of no consequence that the evidence presented by petitioner is controverted by the opinions of experts called by Marentez. The ultimate resolution of these conflicting opinions is for the jury at the trial stage. We must simply determine whether there was evidence presented at the probable cause hearing that provides a rational basis for assuming Marentez is likely to engage in sexually violent predatory criminal behavior if released.
The record is replete with evidence, including his three prior child molestation incidents, two of which resulted in convictions, the very young age of his victims, the fact that at least two of the victims were strangers to him, the fact the offenses occurred over the course of 13 years, his lack of empathy for his victims, his antisocial background and prior nonsexual offenses, his denial of the need for treatment, his lack of treatment, his poor performance on parole including violating the condition that he have no contact with children, his lack of cooperation with the parole agent in other respects, his lack of impulse control, his diagnosis of pedophilia, and the testimony of the various experts about recidivism, that provides an ample rational basis for a reasonable person to assume the possibility that it is likely Marentez will engage in sexually violent predatory criminal behavior if released. We will therefore issue a writ of mandate ordering the court to vacate its order dismissing the petition, to enter an order finding probable cause, and to set the matter for trial.

DISPOSITION
The petition for a writ of mandate is granted, and a writ of mandate is issued ordering respondent court to (1) vacate its order dismissing the petition, (2) reinstate the petition, (3) enter an order finding probable cause to support the petition, and (4) set the matter for trial.
GODOY PEREZ, J., concurs.
GRIGNON, Acting P.J., Dissenting.
The person named in a sexually violent predator petition is entitled to a probable cause hearing. "A judge of the superior court shall review the petition and shall determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory behavior upon his or her release. The person named in the petition shall be entitled to assistance of counsel at the probable cause hearing." (Welf. & Inst.Code, ง 6602, subd. (a).) The probable cause hearing is similar to the preliminary hearing held in a criminal case. (In re Parker (1998) 60 Cal.App.4th 1453, 1469, 71 Cal.Rptr.2d 167.) The probable cause "hearing should allow the admission of both oral and written evidence. . . . [T]he prosecutor may present the opinions of the experts through the hearsay reports of such persons, the prospective [sexually violent predator] should have the ability to challenge the accuracy of such reports by calling such experts for cross-examination. Further, the prospective [sexually violent predator] should have the ability to call such other witness who, upon a proper showing, the superior court judge finds to have relevant evidence to give bearing on the issue of probable cause." (Id. at pp. 1469-1470, 71 Cal.Rptr.2d 167.)
The role of a superior court judge at a sexually violent predator probable cause hearing is similar to the role of a magistrate at a criminal preliminary hearing. The term "probable cause" is "a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion" that the person named in the petition is likely to engage in sexually violent predatory behavior upon release. (People v. Slaughter (1984) 35 Cal.3d 629, 636, 200 Cal.Rptr. 448, 677 P.2d 854.) At the probable cause hearing, the superior court judge "`may *243 weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses.'" (Id. at p. 637, 200 Cal.Rptr. 448, 677 P.2d 854.) The superior court judge "`is entitled to perform adjudicatory functions akin to the functions of a trial judge.'" (Ibid.)
"The character of judicial review . . . depends on whether the [superior court judge] has exercised his power to render findings of fact. If he has made findings, those findings are conclusive if supported by substantial evidence. [Citations.] If he has not rendered findings, however, the reviewing court cannot assume that he has resolved factual disputes or passed upon the credibility of witnesses. A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law." (People v. Slaughter, supra, 35 Cal.3d at p. 638, 200 Cal.Rptr. 448, 677 P.2d 854.) "[F]indings of fact must be sustained if supported by substantial evidence, but a finding of lack of probable cause, unsupported by any factual findings, is reviewed as an issue of law." (Id. at p. 639, 200 Cal.Rptr. 448, 677 P.2d 854.) "Absent controlling factual findings, if the [superior court judge] dismisses a [petition] when the evidence provides a rational ground for believing [the person named in the petition is likely to engage in sexually violent predatory behavior upon his release], his ruling is erroneous as a matter of law, and will not be sustained by the reviewing court." (Id. at pp. 639-640, 200 Cal.Rptr. 448, 677 P.2d 854.)
In this case, the superior court judge made specific factual findings. Because those factual findings are the crux of this case, they are set out in full. The parties presented five expert witnesses. The two experts presented by the District Attorney opined that Paul Marentez was likely to reoffend. Two of the experts presented by Marentez opined that Marentez was not likely to reoffend. The third expert presented by Marentez offered no opinion on this issue. At the conclusion of a four-day evidentiary hearing on probable case, the superior court judge stated in full as follows.
"I think what I said earlier establishes that I am basing this decision on a reasonable cause standard, that I am basing this decision on my view of the demeanor of the witnesses, the manner in which they testified, the certainty with which they had command of the underlying information upon which they based the decision, and also on the issues of the other factors which go into credibility. [ถ] In this case I do believe that Dr. [Barrie Glen] in the end based her opinion upon Static[-]99 alone because that's what she said. I do believe that while she probably did consider clinical matters, in the end when asked she stated her opinion was based on Static[-]99, which we know is not reliable enough according to accepted scientific principles to establish this individual is more likely than not to commit a sexually violent offense. [ถ] With regard to Dr. Vognsen, I said earlier his testimony in court showed a lack of command of the statistical information as compared to Dr. Anderson's. Again, he said his reliance was on Static[-]99. The import of his testimony was that Static[-]99 was the basis of his opinion with a dash of clinical judgment. Again, Static[-]99, as I said, isn't good enough. [ถ] As to this particular defendant, if we are going on statistical probability theory in order to deprive someone of a liberty interest, we are then implicating due process considerations, and I believe that there is authority that probability evidence in a criminal case alone where there's a `beyond a reasonable doubt' standard required is unconstitutional, and I assume because this is a civil proceeding when they say `proof beyond a reasonable doubt,' the same constitutional considerations apply since it's a fundamental liberty interest that is involved. [ถ] Dr. Anderson's testimony with regard to the likelihood of reoffense was validated to some extent by the psychological testing that he gave. Overall, it's the Court's view *244 that Dr. Anderson has far more experience based on evidence presented in administering this kind of testing and dealing with sexual offenders both on a clinical basis and on a research basis, that his testimony was carefully thought out and considered, which I did not find to be the case with the manner in which the two witnesses for [the District Attorney] testified. [ถ] Given that and the testimony of Dr. Vicary on the risk of reoffense, the Court does believe Dr. Vicary. This is a close case, but the Court does not find that the evidence supports a reasonable belief that Mr. Marentez is more likely than not to reoffend in a sexually violent manner, and I say this bearing in mind the issues involved in this case and given that my function as a judge is unclear given the Johannes case,[18] but I am continuing to apply, as I said before, the standards that I think are required, the functions that are required of a probable cause hearing judge after a paper review of the file."
Thus, the superior court judge found that the District Attorney's witness, Dr. Barrie Glen, relied solely on the Static-99 test, which was not sufficiently reliable by itself to establish that Marentez was likely to commit a sexually violent offense upon' release. The superior court judge further found that the District Attorney's witness Dr. Jack Vognsen was not persuasive. The superior court judge found Dr. Vognsen's testimony demonstrated a lack of command of the statistical information and an almost complete reliance on the Static-99 test. In contrast, the superior court judge found the testimony of Marentez's witness Dr. Anderson to be very persuasive. The judge noted that Dr. Anderson's testimony was partially validated by the psychological testing. The judge also noted the vast clinical and research experience of Dr. Anderson. The judge pointed out that Dr. Anderson's testimony had been carefully thought out and considered, in contrast to the District Attorney's two experts. Finally, the superior court judge found the testimony of Marentez's witness Dr. Vicary to be credible.
In my view, the superior court judge made dispositive factual findings. Based on the testimony of Marentez's expert witnesses, the judge found Marentez was not likely to reoffend upon release. Our review is limited to determining whether substantial evidence supports the factual findings. It unquestionably does.
In addition to testifying that in his overall opinion Marentez was not likely to reoffend, Dr. Vicary testified that the Static-99 test was valid and reliable, but was to be used in conjunction with other factors to arrive at a valid opinion on likelihood of reoffending. In addition to testifying that in his overall opinion Marentez was not likely to reoffend, Dr. Anderson testified that the use of statistical and actuarial predictors were problematic in predicting reoffense. He noted the following problems: the factor of prior offenses is of little significance; the prediction includes all sexual offenses and not just violent ones; the various factors overlap; the accuracy rate of the Static-99 test is low when compared to other clinically useful tests; the Static-99 test has no known base rate; the Static-99 test had only recently been developed; the individual factors used in the Static-99 test have only a weak correlation to recidivism; statistical tests are not customarily used in psychology; and the Static-99 test has some value if used appropriately.
All four experts who opined as to likelihood of reoffense testified concerning the Static-99 test. The two experts for the District Attorney relied exclusively or almost exclusively on the results of the Static-99 test. In the case of Marentez, the test indicated a 52 percent chance of reoffense, a likelihood, but not a substantial likelihood. The two experts for Marentez emphasized the shortcomings of the test *245 and stressed that it was not sufficient in and of itself to predict recidivism. The superior court judge was persuaded by this expert testimony and found Marentez's witnesses' opinions of unlikelihood of reoffense to be better founded.
The assertion that the superior court judge excluded evidence of the Static-99 test on the ground of Kelly-Frye[19] is not supported by the record. Evidence of the Static-99 test abounds in the record. The superior court judge simply found that, based on the evidence of the experts, the Static-99 test was not sufficient on its own to support a finding of likely to reoffend. The judge did not reject the test as a factor or tool to be used in connection with other tests and clinical judgment.
The superior court judge at the probable cause hearing made specific factual findings that were dispositive on the issue of likelihood of reoffense. The superior court judge was not required to make factual findings, but was permitted to do so. The findings are supported by substantial evidence, albeit substantial conflicting evidence also existed. Accordingly, the findings are conclusive. A reviewing court is not permitted to substitute other factual findings, which may also be supported by substantial evidence, for the factual findings made by the superior court judge at the probable cause hearing. This is so even if the weight of the evidence supports a finding of probable cause. This is so even if the reviewing court strongly believes the superior court judge was factually incorrect in his determinations. The justice system operates at its best overall, although not necessarily in any specific case, when all the players perform the roles assigned to them.
I would deny the petition.
NOTES
[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Petitioner acknowledges that he has a right to appeal following the dismissal of the petition under Code of Civil Procedure section 904.1, subdivision (a)(1). (See People v. Superior Court (Johannes) (1999) 70 Cal.App.4th 558, 561-562, fn. 5, 82 Cal.Rptr.2d 852.) Petitioner argues, however, that an appeal does not provide an adequate remedy because Marentez will be released into the community on parole while the appeal is pending and could pose a danger to the community based on the allegations in the petition and the evidence presented at the probable cause hearing. These concerns for public safety justify the filing of a petition for a writ of mandate and the issuance of a temporary stay until the propriety of the dismissal order can be reviewed. (Ibid.)
[2] In enacting the Sexually Violent Predators Act, the Legislature stated that "[t]he continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior." (Stats. 1995, ch. 763, ง 1, No. 10 West's Cal. Legis. Service, p. 4611; see Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1144, fn. 5, 81 Cal.Rptr.2d 492, 969 P.2d 584.)
[3] If the experts initially selected disagree as to whether the person meets the statutory criteria, "two independent professionals" must be selected and "further examination" of the alleged predator must occur. (Welf. & Inst. Code, ง 6601, subds. (e), (f) & (g).) A request for a petition for commitment can only be made if both independent professionals concur that the person meets the statutory criteria. (Welf. & Inst.Code, ง 6601, subd. (f).)
[4] In Los Angeles County the designated counsel for this purpose is the District Attorney.
[5] In this case, both Marentez and petitioner agree that the standard at the probable cause hearing should be the same standard utilized at a preliminary hearing in a criminal case.
[6] We note that the statutory scheme does not use the words "more likely than not" in discussing the chances of a person committing a sexually violent offense. The language set forth in the statutes is whether it is "likely" that a person will engage in sexually violent criminal behavior. Throughout the entire probable cause hearing, including in its final ruling, the trial court utilized the concept of "more likely than not." Marentez takes the position that both "likely" and "more likely than not" mean the same thing and that both are synonymous with "probable," which was defined by the Supreme Court in another context as meaning "a better than even chance" or "`better than 50 percent chance."" (People v. Davis (1994) 7 Cal.4th 797, 814, 30 Cal.Rptr.2d 50, 872 P.2d 591 [discussing definition of a viable fetus in a prosecution for fetal murder].) Petitioner asserts that "likely" means "substantial" or "serious potential" and does not establish a mathematical formula requiring a more than 50 percent chance. Petitioner points out that the Supreme Court in Huhbart v. Superior Court, supra, 19 Cal.4th at pages 1163, 1168-1169, 81 Cal.Rptr.2d 492, 969 P.2d 584, stated that sexually violent predators constitute a "substantial" threat to public safety, and that the Sexually Violent Predators Act's definition of dangerousness that incorporates the term "likely" is not materially distinct from other involuntary civil commitments that require findings that there is a "substantial" danger of harm to others or a serious "potential" of harm to others. We also note that in People v. Deskin (1992) 10 Cal.App.4th 1397, 1401-1402, 13 Cal.Rptr.2d 391, the court stated that the term "likely" as used in a child endangerment statute, Penal Code section 273a, subdivisions (a) and (b), meant "reasonably foreseeable" or having a "potential" for grave injury. Because we find that the evidence in the case at bar supports a finding of probable cause under either a "substantial" or a "greater than 50 percent" standard, we need not decide the issue of the proper definition of "likely" in this case.
[7] The United States Supreme Court has noted, in the context of probable cause hearings, that "[t]he use of an informal procedure is justified not only by the lesser consequences of a probable cause determination but also by the nature of the determination itself. It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt. [Citation.]" (Gerstein v. Pugh (1975) 420 U.S. 103, 121, 95 S.Ct. 854, 43 L.Ed.2d 54, fn. omitted.) Of course, the court at the probable cause hearing has the power to resolve conflicts and give or withhold credence to particular witnesses, but this power to resolve factual disputes exists to assist the court in its determination of probable cause, which is measured by a reasonable person standard and not by the court's personal belief that one opinion is "more persuasive" than another. (See People v. Slaughter, supra, 35 Cal.3d at pp. 637-638, 200 Cal.Rptr. 448, 677 P.2d 854.)
[8] In the case at bar, the trial court stated that sufficient evidence was presented for it to find that Marentez suffered from a diagnosed mental disorder of pedophilia. The court expressly ruled that "the diagnosis [of pedophilia] to me for my purposes is clear enough." The court also found that the pedophilia disorder impaired Marentez's emotional and volitional capacity. We note that at the probable cause hearing the only finding the court has to make is whether there is probable cause to believe that the alleged sexual predator is likely to engage in sexually violent predatory criminal behavior upon release. (Welf. & Inst.Code, ง 6602, subd. (a).) The court is not required to make any findings on any of the other criteria of the Sexually Violent Predators Act at the probable cause hearing. Ultimate findings on this criteria and on the other criteria of the Sexually Violent Predators Act are to be made by the trier of fact at the trial stage. (Welf. & Inst.Code, ง 6604.)
[9] The reports of the expert witnesses testifying for both sides were received as evidence in the probable cause hearing. At such a hearing, the prosecutor is allowed to present the contents of the reports as evidence despite their hearsay nature, although the alleged sexual predator is allowed to cross-examine the expert concerning their evaluation and can call the expert to the stand for that purpose. (In re Parker, supra, 60 Cal.App.4th at pp. 1469-1470, 71 Cal.Rptr.2d 167.)
[10] An expert called by Marentez later in the hearing, Dr. Raymond Anderson, relied on self-reporting by Marentez in reaching his conclusion that Marentez was not likely to reoffend.
[11] Dr. Anderson, relied on the penile sizmograph test to assess the risk of reoffense for Marentez, including negative responses.
[12] Dr. Anderson and another expert called by Marentez, Dr. William Vicary, testified that Marentez's sexual offenses against children were actually drug-related behavior rather than a product of any sexual preference for children.
[13] Dr. Anderson testified later in the hearing that the time period was significant to his ultimate determination that Marentez did not even suffer from pedophilia. Of course, the trial court found the evidence was sufficient to show that Marentez in fact suffered from pedophilia, and that the pedophilia impaired his emotional and volitional capacity.
[14] During the course of the argument that followed the presentation of the evidence, the trial court explained in considerable detail its reasoning relating to its ultimate ruling. It is impossible to understand the basis of the ultimate ruling without considering as well the court's detailed explanation of its reasoning. The court itself was well aware of this when it noted just before making the actual ruling that "what I said earlier [during argument] establishes that I am basing this decision" on various considerations, including the reasonable cause standard, demeanor, the "certainty" of the "underlying" basis of the expert opinions, the reliability of the Static-99 according to "accepted scientific principles," and whether the use of statistical probability in order to deprive someone of a liberty interest is an unconstitutional deprivation of due process in a civil proceeding where the ultimate standard of proof at trial is beyond a reasonable doubt. We therefore note in detail the comments the court made during argument in addition to the language of the actual ruling in order to place the ruling in context and make it understandable.
[15] Immediately after declaring that it found the evidence insufficient to support probable cause, the court noted, "I say this bearing in mind the issues involved in this case and given that my function as a judge is unclear . . ., but I am continuing to apply . . . the standards that I think are required, the functions that are required of a probable cause hearing judge. . . ."
[16] Dr. Anderson may have disagreed with the reliability of the Static-99 and the methods used by Dr. Hanson to calculate the risk of reoffense predicted by the instrument, but he did not controvert the fact that Dr. Vognsen utilized the instrument, that Marentez score on the instrument was a 6, or that Dr. Hanson predicted a risk of reoffense of 52 percent based on a score of 6.
[17] The trial court asked Dr. Vognsen if he could say "with reasonable certainty" that Marentez would commit a new sexual offense? Dr. Vognsen replied that the term "reasonable certainty" was not a term he was familiar with in the context of this type of case. The court's use of the term "reasonable certainty" is troubling since the standard set forth in the applicable statutes is simply whether it is "likely" (hat the alleged sexual predator will engage in sexually violent predatory criminal behavior, and the standard for a probable cause hearing is whether a reasonable person could have a strong suspicion that this allegation of the petition is true. Neither of these standards requires "reasonable certainty."

In the course of making its ruling rejecting any expert opinion that was based on the Static-99, the court expressly stated, "If the statistical evidence is going to be used as the basis of the prediction, then the statistical evidence ought to reach reasonable certainty for purposes of the probable cause hearing, and it seems to me if a witness is relying on the statistical evidence to voice an opinion and the statistical evidence doesn't with reasonable certainty predict an individual respondent's recidivistic likelihood, then it seems to me that opinion is worthless for purposes of establishing probable cause."
[18] An unpublished opinion of another division of this district, reversing the dismissal of a sexually violent predator petition after this same judge dismissed the petition after a probable cause hearing.
[19] People v. Kelly (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240; Frye v. United States (D.C.Cir.1923) 293 F. 1013.