NO. 4-00-0404

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Detention of David Isbell, ) Appeal from

THE PEOPLE OF THE STATE OF ILLINOIS, ) Circuit Court of

Petitioner-Appellee, ) Piatt County

) No. 99MR11

DAVID ISBELL, )

Respondent-Appellant. ) Honorable

) John P. Shonkwiler,

) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

Respondent David Isbell appeals from the order of the Piatt County circuit court committing him to the Department of Human Services pursuant to the Sexually Violent Persons Commitment Act (725 ILCS 207/1 through 99 
(West 1998)).  We affirmed the trial court in 
In re Detention of Isbell
, No. 4-00-0404 (January 23, 2002) (unpublished order under Supreme Court Rule 23).  On January 22, 2002, the United States Supreme Court decided 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002).  We granted respondent's petition for rehearing to consider the possible effect of 
Crane
 on this case.  We find that the decision in 
Crane
 does not affect our previous ruling, and we affirm.

I. BACKGROUND

On May 11, 1999, the People of the State of Illinois filed a sexually violent person petition pursuant to the Act, seeking an order for detention and an order for commitment of the person of respondent.  Respondent was scheduled to be released from prison on May 13, 1999, upon completion of his sentence for a 1992 conviction for aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12-14(b)(1)). 

The petition alleged that respondent had the following mental disorders, as described in the American Psychiatric Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV), which created a substantial probability that he would engage in future acts of sexual violence:  pedophilia, sexually attracted to females, nonexclusive type; alcohol abuse in a controlled environment; antisocial personality disorder, severe, with narcissistic traits; asthma; problems relating to social environment; and global assessment functioning of 55.  The petition also alleged that in March and April 1999, two women came forward and reported that they had been sexually assaulted by respondent.  

Respondent's trial was held on January 11 through 13, 2000.  The People's first witness, Bonnie R., was the victim of the sexual assault to which respondent pleaded guilty in 1992.  This victim was respondent's niece.  She was eight or nine years old when the sexual assault occurred.  Respondent objected to this witness's testimony and offered to stipulate that respondent pleaded guilty to the sexual assault in 1992.  This witness testified to the details of the sexual assault that led to the 1992 charges against respondent and the eventual guilty plea and incarceration.     

The People introduced into evidence a photograph of Bonnie R. taken around the same time she was sexually assaulted by respondent.  Respondent objected to the introduction of the photograph because it was not provided in discovery.  The People responded that the photograph was not provided in discovery because the witness had unexpectedly produced the photograph that day.  The People sought to introduce the photograph into evidence on the basis that the prepubescent appearance of the alleged victims at the time of the alleged assaults was relevant to the diagnosis of respondent's pedophilia.  The People also informed the court that all of the witnesses claiming to have been sexually assaulted by respondent unexpectedly brought photographs to court that day and that the People wanted to introduce all of the photographs into evidence.  The court noted respondent's continuing objection and allowed the photographs into evidence because nothing was inflammatory or prejudicial about the photographs, and because respondent would have the opportunity to cross-examine the witnesses about the authenticity of the photographs.  

The People's next witness, Joann M., was Bonnie R.'s sister.  This witness testified that sometime in 1983 or 1984, when she was 9 or 10 years old, respondent had sexually assaulted her.  This witness did not come forward with her accusations until after she learned that respondent had sexually assaulted her younger sister.  The People introduced into evidence a photograph of Joann M. when she was 9 or 10 years old.  

The People then called Dr. Jacqueline Buck to testify as an expert witness.  Dr. Buck was a clinical psychologist employed by the Illinois Department of Corrections.  Dr. Buck testified that she had evaluated respondent personally and studied his records, and she diagnosed him as a pedophile with an alcohol problem and a severe antisocial personality disorder.  It was Dr. Buck's professional opinion that there was a substantial probability that respondent would commit more acts of sexual violence.  Dr. Buck cited several factors that led to her conclusion; among those were respondent's failure to attend sex-offender treatment, his denial that he had done anything wrong, the fact that his alcohol abuse would lower his inhibitions and make him more likely to succumb to his sexual urges, and the fact that his antisocial disorder meant he did not care about the harm he did to others.  Additionally, Dr. Buck administered to respondent the Minnesota Sex Offender Screening Tool Revised, which indicated respondent had an 87.5% chance of reoffending.

     The People elicited testimony from Dr. Buck that in forming her opinion she relied in part on transcripts of interviews with Veronica S. and Michelle I., the women who came forward in March and April 1999 with accusations that respondent sexually assaulted one and attempted to sexually assault the other in 1974.  Dr. Buck also relied on statements and reports made by Veronica S.'s and Michelle I.'s mothers regarding the events surrounding the alleged sexual assault and attempted sexual assault in 1974.  Dr. Buck testified that the time frame and details of the past instances of sexual assault and attempted sexual assault were relevant to the diagnosis of respondent's mental disorders.  

Over respondent's objection, Dr. Buck was allowed to retell in detail allegations of sexual assault and attempted sexual assault told to her by these women and their mothers.  According to Dr. Buck, it was common for experts in her field to rely on this kind of information when forming their professional opinions.  When asked why no action was taken by authorities against respondent in 1974 when the assaults were reported, Dr. Buck answered that the authorities said because respondent was 15 years old at the time, it was one child's word against another and it would not go anywhere in court.  Dr. Buck also testified that it was common for child victims of sexual assault not to come forward with their accusations until they were adults, that the alleged victims' stories were credible, and that she personally believed the victims.  

After Dr. Buck testified, the People called Veronica S., Michelle I., and their mothers.  Each of these witnesses in turn told firsthand the same stories just related secondhand by Dr. Buck.  The People sought to introduce into evidence photographs of these accusers, but only one alleged victim's photograph was allowed because the other could not say how old she was in the photograph.

The People's next witness was Dr. Paul Heaton.  Dr. Heaton was a licensed clinical psychologist who provided specialized sex-offender evaluations under a contract with the Illinois Department of Human Services.  Dr. Heaton also relied upon and related in his testimony the contents of the same various reports and interviews that Dr. Buck had relied upon, including a statement by a school janitor that in 1974 he witnessed respondent committing one of the sexual assaults.  

Dr. Heaton testified that he had evaluated respondent personally and studied his records, and he diagnosed him as a pedophile with an alcohol problem and a severe antisocial personality disorder.  It was Dr. Heaton's professional opinion that respondent suffers from a mental disorder that predisposes him to commit acts of sexual violence.  Dr. Heaton also testified that it was substantially probable that respondent will reoffend in the future because respondent demonstrated many of the risk factors that have been found historically to indicate a sex offender will reoffend.  On cross-examination, Dr. Heaton testified that he believed respondent's control over his emotions and actions is compromised by his mental disorder, but Dr. Heaton believed that respondent "has some ability to control his actions."

The final witness to testify was Debbie Cunningham, a therapist specializing in sex offenders at the Coles County Medical Center.  Cunningham testified that while respondent was on parole in 1997 he failed to complete a required sex-offender treatment program.  Respondent's dismissal from the program resulted in his parole being revoked.  Cunningham also gave an unresponsive answer to a question while testifying, the sum of the unsolicited information being that respondent had admitted molesting two of his nieces.  The trial court instructed the jury not to consider that statement.  

At the close of evidence, the jury was instructed to determine whether the People had proved beyond a reasonable doubt that respondent was a sexually violent person.  A sexually violent person was defined for the jury as "a person who has been convicted of a sexually violent offense and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."  The jury was instructed that aggravated criminal sexual assault was a sexually violent offense.  A "mental disorder" was defined for the jury as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence."  The jury returned a verdict finding respondent to be a sexually violent person.  The appeal followed.   

II. ANALYSIS

Respondent's arguments on appeal can be summarized as two distinct claims:  a challenge to the constitutionality of the Act as applied in this case and an argument that the cumulative impact of errors in allowing testimony and exhibits into evidence resulted in prejudice requiring reversal.  We address each argument in turn.

A. Respondent's Constitutional Challenge

Respondent argues that under the United States Supreme Court decision in 
Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867, a civil commitment statute such as the Act is only constitutional so long as the statute requires a finding that the person being committed is unable to control his dangerousness.  Therefore, respondent argues, the trial court committed reversible error when it refused to give a jury instruction that required a specific finding that respondent lacked emotional or volitional control over his sexual behavior.

Prior to 
Crane
, the Supreme Court of Illinois found that due process does not require a jury to make a specific finding that a sex offender lacks emotional or volitional control over his sexual behavior to support a commitment.  See 
In re Detention of Varner
, 198 Ill. 2d 78, 84, 759 N.E.2d 560, 564 (2001).  
Varner
, like this case, dealt with the Act which defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence."  725 ILCS 207/5(b) (West 1998).  The Supreme Court of Illinois found that when a jury finds a sex offender to be a sexually violent person, that necessarily requires finding that the sex offender has a "mental disorder," and the Act's definition of mental disorder "was sufficient to 'narrow[] the class of persons eligible for confinement to those who are unable to control their dangerousness.'"  
Varner
, 198 Ill. 2d at 84, 759 N.E.2d at 564, quoting 
Kansas v. Hendricks
, 521 U.S. 346, 358, 138 L. Ed. 2d 501, 513, 117 S. Ct. 2072, 2080 (1997).

The United States Supreme Court's case of 
Crane
 was an appeal from the Kansas Supreme Court's decision in 
In re Crane
, 269 Kan. 578, 585-86, 7 P.3d 285, 290
 (2000), wherein the Kansas Supreme Court found that a specific jury determination of lack of control was required for civil commitment of a sex offender. 
 The United States Supreme Court held that the Constitution does not permit commitment of dangerous sexual offenders 
without any lack-of-control determination, but the lack of control does not have to be a total or complete lack of control.  
Crane
, 534 U.S. at __, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.  
Crane
 did 
not
 find that the Constitution requires a specific jury determination that a respondent lacks volitional control in every case as respondent suggests, because 
Crane
 upheld the commitment in the prior case of 
Hendricks
 as constitutional, even though there was no specific jury determination of lack of control in 
Hendricks
.  
Crane
, 534 U.S. at ___, 151 L. Ed. 2d at 863, 122 S. Ct. at 871; see also 
People v. Hancock
, 329 Ill. App. 3d 367, 375, 771 N.E.2d 459, 465 (2002). 

Crane
 requires some determination of lack of control over behavior before a sex offender may be civilly committed.  In this case, there was a determination by the jury that respondent lacked control over his behavior.  The jury was instructed that it had to find beyond a reasonable doubt that respondent suffered from a mental disorder, which by definition was a finding that respondent had a congenital or acquired condition "affecting his emotional or volitional capacity that predisposes him to engage in acts of sexual violence."  Therefore, there was no need for the jury to make an additional finding that respondent lacked emotional or volitional control over his sexual behavior.  
Varner
, 198 Ill. 2d at 84-85, 759 N.E.2d at 564.

B. Cumulative Impact of Errors in Allowing Testimony

 and Exhibits into Evidence 

Respondent's first argument regarding improperly admitted evidence is that the trial court erred by allowing the experts to testify to various facts and conclusions found in the contents of the reports they relied upon in forming their professional opinions.  The first items of testimony by the expert witnesses that respondent complains about are Dr. Buck's testimony that no action was taken against respondent in 1974 because the authorities told the alleged victim's mother that it was one child's word against another and it would not go anywhere in court, and Dr. Heaton's testimony that respondent had been identified by a school janitor as the perpetrator of a sexual assault in 1974.

It is the rule in Illinois "that an expert may give his opinion based upon facts that are not in evidence if those facts are of a type reasonably relied upon by experts in the particular field."  
People v. Nieves
, 193 Ill. 2d 513, 527-28, 739 N.E.2d 1277, 1284 (2000), citing 
Wilson v. Clark
, 84 Ill. 2d 186, 193, 417 N.E.2d 1322, 1326 (1981) (adopting Federal Rule of Evidence 703).  "While the contents of reports relied upon by experts would be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion."  
Nieves
, 193 Ill. 2d at 528, 739 N.E.2d at 1284. 

Respondent argues that the trial court abused its discretion by allowing admission of these first items of complained-of testimony because the testimony was not offered for the limited purpose of permitting the experts to explain the basis for their opinions.  Particularly, respondent argues that the jury had no reason to think the complained-of testimony was not offered for the truth of the matter asserted (that respondent committed uncharged acts of sexual assault) because the trial court did not give the jury a limiting instruction and because Dr. Buck was allowed to testify that she found the allegations in the reports to be credible.

In ruling on respondent's objection to the complained-of testimony, the trial court found that the testimony could be allowed if the experts testified that they relied on the reports in forming their opinions.  The People were very thorough in prefacing the expert's testimony by asking them if they relied upon the reports in forming their opinions and whether it was common for experts in their field to rely on such reports.  While it may have been preferable for the trial court to give a limiting instruction, since the trial court's intention was not to allow the evidence substantively, we will not disturb the court's decision.  See 
People v. Pasch
, 152 Ill. 2d 133, 176-77, 604 N.E.2d 294, 311 (1992) (trial court's decision to allow expert's hearsay testimony without limiting instruction upheld because trial court's intention not to allow the evidence substantively was manifested to jury through rulings in the trial).    

Respondent further argues that the trial court erred in allowing testimony that it was common for child victims of sexual assault not to come forward with their accusations until they were adults, and that one accuser's mother did not pursue charges against respondent because she wanted to protect her daughter. Respondent argues that this evidence was irrelevant and prejudicial because the purpose of the trial was to determine respondent's current mental condition, not to determine the fears and regrets the alleged assaults caused in the victims.

When the issue is the propriety of allowing an expert to disclose substantively inadmissible underlying facts to explain his opinion, "'[t]he proponent of the evidence should be required to satisfy the court both that such items are of the type customarily relied upon by experts in the field[] 
and
 
that
 
such
 
items
 
are
 
sufficiently
 
trustworthy
 
to
 
make
 
such
 
reliance
 
reasonable
.'  (Emphasis in original.)  [Citation.]"  
Lovelace v. Four Lakes Development Co.
, 170 Ill. App. 3d 378, 384, 523 N.E.2d 1335, 1339 (1988).  In this case, the complained-of testimony was offered to explain why the accusers would not pursue their allegations against respondent when the alleged assaults occurred, thereby demonstrating why the reports were trustworthy and reasonably relied upon despite the fact that the accusations were only recently made.  Under 
Lovelace
, the experts in this case were required to explain why the reports they relied upon were trustworthy, which they did.  It was not an abuse of discretion for the trial court to allow this testimony.         

Respondent also argues that the trial court erred in allowing Dr. Buck to comment on the credibility of the accusers. Dr. Buck obviously had to make an initial determination of the accusers credibility to decide whether to rely upon their reports in forming her professional opinions.  It was not improper for Dr. Buck to testify that she found the allegations made in the reports to be credible because that testimony was only admitted to demonstrate the basis of her opinion.  The People offered the testimony of the accusers themselves for the truth of the matter asserted. 

Respondent's second argument regarding improperly admitted evidence involves the admission of the photos of the victims and alleged victims.  The People wanted to introduce them to demonstrate that the victim and alleged victims looked prepubescent when the assault and alleged assaults occurred, to support respondent's pedophilia diagnosis.  However, the People did not need to enter the photographs to make their case.  
In re Detention of Walker
, 314 Ill. App. 3d 282, 293-94, 731 N.E.2d 994, 1001-02 (2000) (alleged victims' physical characteristics do not have to be known to determine whether diagnosis of pedophilia is proper.)  The trial court allowed the photographs into evidence because it found that the photographs were neither inflammatory nor prejudicial. 

Respondent's third argument regarding improperly admitted evidence involves the admission of Bonnie R.'s testimony about the details of the sexual assault for which respondent was convicted, offered to prove respondent had been convicted of the prerequisite sexually violent offense.  The introduction of a certified copy of respondent's 1992 conviction would have been sufficient to prove that respondent was convicted of a prerequisite sexually violent offense required for commitment under the Act.  
People v. Winterhalter
, 313 Ill. App. 3d 972, 979, 730 N.E.2d 1158, 1164 (2000); see also 
People v. Peete
, 318 Ill. App. 3d 961, 969, 743 N.E.2d 689, 695 (2001) (error not to accept stipulations to prior convictions that are an element of the crime charged).  However, the testimony of the details of the sexually violent offense that led to the prerequisite conviction under the Act is admissible "if relevant to the remaining issues of whether the person has a mental disorder and is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence."  
Winterhalter
, 313 Ill. App. 3d at 979, 730 N.E.2d at 1164; see 725 ILCS 207/15(b)(4), (b)(5) (West 1998).

The admissibility of evidence is within the sound discretion of the trial court and its decision will not be overturned absent an abuse of that discretion.  
People v. Illgen
, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991).  It is not apparent that the trial court abused its discretion in allowing the photographs and the testimony from Bonnie R. into evidence.  However, even if there was error, any error was harmless in light of the overwhelming evidence supporting the jury's verdict.  

The Illinois Supreme Court has stated that under the Act: 

"A defendant cannot be involuntarily committed based on past conduct.  Involuntary confinement is permissible only where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence 
in
 
the
 
future
."  (Emphasis added.)  
In re Detention of Samuelson
, 189 Ill. 2d 548, 559, 727 N.E.2d 228, 235 (2000).

Under the Act, the only relevant consideration is whether a respondent presently suffers from a mental disorder creating a substantial probability that he will engage in acts of sexual violence in the future.  If the evidence supporting the jury's verdict that the respondent presently suffers from the kind of mental disorder contemplated by the Act was insufficient or closely balanced, that would raise a concern that respondent was actually being punished for his past conduct.  Then any errors in admitting evidence about respondent's past conduct may require reversal.  That, however, is not the case here.      

There was overwhelming evidence that supported the jury's finding that respondent presently suffers from a mental disorder and the disorder created a substantial probability that he will engage in acts of sexual violence in the future.  Both Dr. Buck and Dr. Heaton diagnosed respondent as a pedophile with an alcohol problem and a severe antisocial personality disorder.  It was Dr. Buck's and Dr. Heaton's  professional opinion that respondent suffers from a mental disorder which predisposes him to commit acts of sexual violence and that it was substantially probable that respondent will reoffend in the future because respondent demonstrated many of the risk factors that have been found historically to indicate a sex offender will reoffend.  Respondent had been committing violent sexual assaults since 1974.  He continued to deny that he had a problem and refused to complete sex-offender counseling.  Finally, Dr. Buck testified that test results indicated respondent had an 87.5% chance of reoffending.  In light of evidence supporting the jury's verdict, there was no prejudice in allowing Bonnie R. to testify.

III. CONCLUSION

The Act (725 ILCS 207/1 through 99 (West 1998)) is constitutional as applied in this case, the jury was not required to make a specific finding that respondent lacked emotional or volitional control over his actions, and there was no prejudicial error.  Therefore, we affirm the order of the Piatt County circuit court committing respondent to the Department of Human Services.  

Affirmed.             

KNECHT and STEIGMANN, JJ., concur.