*In re* DETENTION OF PAUL B. BOLTON (The People of the State of Illinois, Plaintiff-Appellee, v. Paul B. Bolton, Defendant-Appellant).

Fourth District    No. 4—02—0515

Opinion filed November 13, 2003.

Daniel B. Kennedy, of Champaign, for appellant.

Lisa Madigan, Attorney General, of Chicago (William L. Browers, Anne S. Bagby, and Lisa Anne Hoffman, Assistant Attorneys General, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

Defendant, Paul B. Bolton, appeals an April 16, 2002, jury verdict finding him to be a sexually violent person pursuant to Illinois's Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 through 99 (West 2000)). We reverse and remand.

## I. BACKGROUND

On April 7, 1994, defendant pleaded guilty to criminal sexual assault (720 ILCS 5/12—13(b) (West 1994)), a Class X felony, for molestation and oral sex upon a child, his stepsister, which he admitted began when she was 6 years old and he was 12 years old. (Defendant was born in 1976.) Defendant was sentenced to four years' intensive probation. On June 19, 1995, defendant was found in violation of his probation for attempting to lure a five-year-old girl to an area secluded by a tarp for a sexual offense. He was accordingly sentenced to 12 years' imprisonment in the Illinois Department of Corrections (DOC). Defendant was scheduled for mandatory supervised release on February 27, 2001.

Prior to defendant's release, Dr. Jacqueline N. Buck, a licensed clinical psychologist working for the special evaluation unit of DOC, reviewed defendant's DOC file to determine whether he met the criteria for a sexually violent person under the Act and was therefore in need of a clinical interview. The purpose of a clinical interview is to identify sex offenders who are leaving DOC and have a high risk to reoffend in order to civilly commit them to the Department of Human Services for sex-offender treatment.

On December 22, 2000, Dr. Buck interviewed defendant and decided not to refer defendant for commitment under the Act because he had completed almost two years of sex-offender treatment at the Big Muddy Correctional Facility. In January 2001, Amanda Swope, defendant's ex-girlfriend and mother of his child, telephoned DOC and expressed concern for the safety of herself and her child after defendant's release. Due to this call, Dr. Buck reevaluated defendant using information she did not have when making her initial decision. Dr. Buck found this information significant and referred defendant for commitment. On February 26, 2001, the State filed a petition seeking a finding that defendant was a sexually violent person and should be committed pursuant to the Act.

At trial, the State presented Dr. Buck and Dr. Phil Reidda, a licensed clinical psychologist working for Affiliated Psychologists Limited, an organization independently contracted by the State to perform evaluations on persons for whom an Act probable-cause determination has been made. Both Dr. Buck and Dr. Reidda found

defendant met the DSM—IV—TR (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders DSM—IV—TR, at xxxiii (4th rev. ed. 2000)) diagnostic criteria for (1) pedophilia, sexually attracted to females, nonexclusive type; (2) paraphilia, not otherwise specified, sexually attracted to nonconsenting females, nonexclusive type; (3) voyeurism; (4) antisocial personality disorder, severe; and (5) narcissistic personality disorder, severe.

They testified defendant has a mental disorder such that he has serious difficulty in controlling his behavior, and there is a substantial probability defendant will engage in acts of sexual violence in the future unless significant intervention has taken place. See 725 ILCS 207/5(f) (West 2000). They based their opinions on the results of psychological tests and actuarial tools, as well as a clinical interview and a review of defendant's juvenile and adult criminal, sexual, and treatment history.

Defendant presented Dr. Larry M. Davis, a licensed physician specializing in psychiatry who had examined defendant for the purpose of this litigation. Dr. Davis diagnosed defendant with pedophilia, sexually attracted to females, nonexclusive type, and voyeurism. He did not believe there was a substantial probability defendant would sexually reoffend. He based his opinion on evidence of defendant's treatment at the Big Muddy Correctional Facility. Due to defendant's high intelligence, further education activity, ongoing therapy, and direct experience of DOC punishment, he felt that defendant's behavior is controllable. In addition, Dr. Davis contended that the experts in the field agree that the reoffense rate for incestuous sexual molesters is lower than nonincestuous molesters. The fact that defendant's victims are female also lowers his likelihood of reoffending. Dr. Davis did not rely on actuarial tools to assess defendant's risk for recidivism.

Defendant also presented Dr. Terence Campbell, a licensed clinical psychologist who reviewed defendant's psychological evaluations. Dr. Campbell testified at length regarding the history and criticisms of the actuarial tools used in this case. He based many of his opinions on two articles published after Dr. Buck and Dr. Reidda analyzed defendant. Dr. Campbell argued the correlation between the risk factors used by Dr. Buck and Dr. Reidda and recidivism was not statistically significant; the correlation could occur by chance alone. On cross-examination, Dr. Campbell admitted that one of the articles he relied on concluded that the VRAG (Violence Risk Appraisal Guide) and Static-99 tools were found to predict violent and sexual recidivism. He admitted that the actuarial tools used in this case are the best available. He testified that although the tools are used all over the nation, they are not necessarily being used accurately.

The State called rebuttal witness Dr. Dennis Doren, a licensed psychologist, to testify regarding the actuarial tools. He testified that the concept of actuarial tools goes back in psychology almost 100 years with the first intelligence test. In 14 of the 15 states that have sex-offender civil-commitment statutes, at least some of the evaluators use actuarial tools as part of their assessment process. The Association for the Treatment of Sexual Offenders (ATSA) has a policy that evaluators should use validated actuarial risk-assessment tools. He did not consider actuarial tools to be experimental because they are nationally and internationally well tested. Each instrument is complete, but the research continues to improve upon that product.

A jury returned a verdict in favor of committing defendant as a sexually violent person pursuant to the Act. On June 4, 2002, the trial court found commitment to institutional care in a secure facility, the Department of Human Services, to be the least-restrictive treatment alternative and ordered defendant committed accordingly. This appeal followed.

## II. ANALYSIS

Defendant raises four issues on appeal: (1) whether the trial court erred in refusing defendant's proposed jury instructions regarding his ability to control his sexual behavior, (2) whether defendant's court-appointed counsel was ineffective for failing to object to the introduction of evidence of prior sexual activity that did not consist of "sexually violent offenses" as that term is defined in the Act (725 ILCS 207/5(e) (West 2000)), (3) whether the Act is unconstitutional in that it fails to require the Department of Human Services to provide treatment designed to effect recovery from the pertinent mental disorder, and (4) whether the trial court erred in denying defendant's motion for a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) regarding expert testimony based on actuarial data. We reject defendant's first three issues, but we agree the trial court erred in denying defendant's motion for a *Frye* hearing.

Defendant, in a supplemental brief, asks this court to consider whether the trial court improperly denied defendant's motion for a *Frye* evidentiary hearing on the admissibility of the actuarial tests relied upon or referred to by the State's expert witnesses, Dr. Buck and Dr. Reidda. The trial court found that the proffered sexually-violent-person risk assessments were not "new" or "novel" scientific evidence subject to *Frye* admissibility standards. At trial, both doctors relied, in part, upon their scoring and evaluation of defendant on certain actuarial tools, including the Minnesota Sex Offender Screening Tool (MnSOST), Minnesota Sex Offender Screening Tool—Revised

(MnSOST-R), the VRAG, the Hare Psychopathy Checklist—Revised (PCL-R), the Static-99, and the Hanson and Bussiere Meta-analysis, to form an opinion regarding defendant's probability of recidivism.

Two recent Illinois cases have determined that an expert's testimony predicated upon the MnSOST, MnSOST-R, RRASOR (Rapid Risk Assessment of Sexual Offense), and Static-99 tests does not satisfy the *Frye* test for admissibility. *People v. Taylor*, 335 Ill. App. 3d 965, 979-80, 782 N.E.2d 920, 932 (2002) (Second District); *In re Detention of Hargett*, 338 Ill. App. 3d 669, 675, 786 N.E.2d 557, 562 (2003) (Third District).

■ In Illinois, the admission of expert testimony is governed by the *Frye* standard: whether the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 77, 767 N.E.2d 314, 323-24 (2002) (see also footnote 1 (199 Ill. 2d at 80 n.1, 767 N.E.2d at 325-26 n.1, court has not yet considered adoption of a new standard consistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)); *Frye v. United States*, 293. F. 1013 (D.C. Cir. 1923). General acceptance of methodologies does not require universal acceptance, and the trial judge applies the *Frye* test only if the scientific principle, technique, or test offered by the expert to support his or her conclusion is "new" or "novel." *Donaldson*, 199 Ill. 2d at 78-79, 767 N.E.2d at 324. General acceptance and reliability are not two separate questions. The determination of the reliability of an expert's methodology is naturally subsumed by the inquiry into its general acceptance in the scientific community. *Donaldson*, 199 Ill. 2d at 81, 767 N.E.2d at 326.

There is a preliminary question whether *Frye* applies at all to psychological testimony. See *People v. Ward*, 71 Cal. App. 4th 368, 373, 83 Cal. Rptr. 2d 828, 831 (1999) (psychological evaluation is a learned professional art rather than the exact science with which *Frye* is concerned). The Seventh Circuit, however, has held that *Daubert* "is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir. 1996); *Daubert*, 509 U.S. at 589, 125 L. Ed. 2d at 480, 113 S. Ct. at 2795 (gatekeeping function applies to all forms of "scientific, technical, or other specialized *knowledge*" (emphasis in original and omitted)); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 246, 119 S. Ct. 1167, 1171 (1999) (*Daubert* applies not only to testimony based on " 'scientific' " knowledge, but also to testimony based on " 'technical' " and " 'other specialized' knowledge").

The United States Supreme Court, without discussing *Frye*, has

unenthusiastically declared that psychiatrists' predictions of future violence are admissible. "We are not persuaded that such testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899, 77 L. Ed. 2d 1090, 1108, 103 S. Ct. 3383, 3397-98 (1983) (the American Psychiatric Association had filed an *amicus* brief stating that psychiatric predictions of long-term dangerousness were unreliable).

As a result of *Barefoot*, it has been concluded that a psychologist's or psychiatrist's opinion as to an individual's future dangerousness is generally admissible when that opinion is based upon clinical observation or the evaluator's personal experience. *Taylor*, 335 Ill. App. 3d at 976, 782 N.E.2d at 929. Some jurisdictions have gone on to conclude that actuarial instruments are not subject to *Frye* analysis because they are part of a psychologist's or psychiatrist's methodology to predict future dangerousness. See, *e.g., Garcetti v. Superior Court*, 85 Cal. App. 4th 508, 543, 102 Cal. Rptr. 2d 214, 238 (2000), *rev'd & remanded by Cooley v. Superior Court*, 29 Cal. 4th 228, 57 P.3d 654, 127 Cal. Rptr. 2d 177 (2002); 1 J. Strong, McCormick on Evidence § 206, at 764 (5th ed. 1999) (same argument was made in support of polygraph examinations). Actuarial tests, however, as presented to the jury in this case, add a quality of mathematical or objective certainty to what is otherwise the subjective opinion of the expert witness. There is an inconsistency in the argument that actuarial instruments are not subject to *Frye* because they are a part of the psychologist's art but actuarial instruments are better than the psychologist's clinical judgment alone.

■ We agree with the well-reasoned decision in *Taylor* that the psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence subject to *Frye*. *Taylor*, 335 Ill. App. 3d at 976, 782 N.E.2d at 929. *Taylor* pointed to other Illinois decisions holding that *Frye* should govern the admissibility of psychological and psychiatric expert testimony that is not predicated solely on the evaluator's own clinical observation and experience. *Taylor*, 335 Ill. App. 3d at 975-76, 782 N.E.2d at 929, citing *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 154, 759 N.E.2d 1002, 1012-13 (2001), and *People v. Shanahan*, 323 Ill. App. 3d 835, 837-38, 753 N.E.2d 1028, 1031-32 (2001) ("battered child syndrome"); see also *People v. Zayas*, 131 Ill. 2d 284, 546 N.E.2d 513 (1989) (hypnotically refreshed testimony obtained by psychiatrist inadmissible); *People v. Baynes*, 88 Ill. 2d 225, 430 N.E.2d 1070 (1981) (polygraph testimony inadmissible).

There is a danger that actuarial instruments may intrude upon

the proper functioning of the jury, that they may instill a false confidence or carry a misleading sense of scientific infallibility. *Donaldson*, 199 Ill. 2d at 86-87, 767 N.E.2d at 329. Where the expert's methods involve principles that are comprehensible to a jury, the concerns over the evidence exerting undue influence and inducing a battle of the experts have less force. On the other hand, when the nature of the technique is more esoteric, as with some types of statistical analyses, or when subjective judgments are misleadingly presented as hard science, a stronger showing of probative value should be required. 1 J. Strong, McCormick on Evidence § 203, at 735 (5th ed. 1999). The supreme court concluded, in *Donaldson*, that "extrapolation," establishing a cause and effect relationship based upon similar, yet not identical, scientific studies and theories, did not require a *Frye* test. "[E]xtrapolation by nature admits its fallibility—the lack of specific support to establish the existence of a known cause and effect relationship." *Donaldson*, 199 Ill. 2d at 87, 767 N.E.2d at 329. That is not true of actuarial instruments, which are presented as reliable methods of determining future dangerousness.

Are these actuarial instruments no different from actuarial tables for life expectancy? Life expectancy tables look to a single, easily identified factor, age, and announce what past experience has been. The actuarial tests before us are more complicated. First, the relevant factors must be identified. Is the sex of the offender relevant? His age? Whether he likes broccoli? Can certain factors ever be ignored? Selection of the appropriate factors is not simply a mathematical computation. Next, it must be determined what weight to assign to the various factors, and then it must be determined how to score the results. Does a score of 23 equate with a high probability of reoffending? It is not necessary to conduct a *Frye* hearing on Newton's laws of motion, but the inductive reasoning employed in these actuarial tests presents a different question. The fact that statistics have been used for many years does not mean that it is impossible for any controversy to arise. See *People v. Miller*, 173 Ill. 2d 167, 188-89, 670 N.E.2d 721, 731-32 (1996) (controversy over statistical frequency of a DNA (deoxyribonucleic acid) match within a certain population).

Some experts have testified that actuarial instruments provide a significant amount of information that far exceeds a psychologist's ability to make predictions based purely on expert opinion or clinical judgment alone. See *Taylor*, 335 Ill. App. 3d at 979, 782 N.E.2d at 932 (testimony of Dr. Barry Leavitt). That testimony may simply reinforce the dangers of relying on psychological testimony in this area. If the testimony of the psychologist is, as some have suggested, not scientific evidence at all, but simply testimony as to the psychologist's observa-

tions, it should be given no greater weight than that of a lay witness. Supposed "expert" testimony may provide an easy answer to a question that is almost impossible to answer. In child custody cases, the concern has been expressed that the testimony of psychologists allows judges to avoid difficult decisions and simply defer to the recommendation of the psychologist. H. Gitlin, *Mental-Health Professionals in Child-Custody Cases: Giving "Expert" Testimony Its Due*, 89 Ill. B. J. 350, 353-54 (2001). The same may be true for juries who must determine whether an individual is a sexually dangerous person.

Dr. Doren testified that the concept of actuarial tools is not novel, that the concept goes back in psychology almost 100 years with the first intelligence test. Dr. Doren is a psychologist, and it is not clear what expertise he has in the field of statistics. See *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (expert cannot incorporate the opinion of another on a subject for which he is not qualified). In any event, Dr. Doren's observation is too general to be of any significance. The particular methodologies employed in this case are of recent development. They have not been subjected to empirical testing. They are controversial and have been frequently criticized.

It is true that many psychologists and psychiatrists utilize these instruments. *Taylor*, 335 Ill. App. 3d at 978, 782 N.E.2d at 931. It is not clear, however, whether these instruments have any use outside the courtroom setting. See Reference Manual on Scientific Evidence 26 (2d ed. Federal Judicial Center 2000) (concern with result sometimes reached under *Frye* when testimony was admitted once experts pointed to a consensus in a narrow field they had themselves established). We agree with *Taylor*, that in the absence of any significant peer review of the validity and reliability of these instruments, we cannot accept the State's conclusory assertions that the instruments have gained general acceptance in the scientific communities. Nor can we accept the *ipse dixit* of the witnesses that they are experts and know best whether these tests are valid. In *Taylor*, both Drs. Maskel and Leavitt testified that there was significant controversy surrounding these instruments and the manner in which they should be used. To that must be added the testimony of Drs. Davis and Campbell in this case.

Psychologists are permitted to give statistical testimony, for example, that experience has shown that certain categories of offenders are reincarcerated at a certain rate. Where the jury is not given evidence that is comprehensible to it, however, but is asked to simply accept the instrument's conclusion that defendant is in the category of "very high risk of committing future acts of sexual violence," there is

a danger that the jury will abandon its function of weighing the evidence. Statistical indicators present a particular problem where they pertain to volitional conduct.

"[W]here the statistical indicators pertain to volitional conduct, the courts are cautious because they place great weight on a conception of human autonomy and dignity that the coldly statistical analysis would undermine. To put it another way, shying away from the statistical predictions reflects a belief that everyone should have the opportunity to depart from the statistical norm." 1 J. Strong, McCormick on Evidence § 210, at 805 n.3 (5th ed. 1999).

## III. CONCLUSION

■ Because the use of actuarial instruments in these cases has not been approved in a *Frye* test, we reverse the trial court's judgment declaring defendant a sexually violent person under the Act and remand for further proceedings.

Reversed and remanded.

MYERSCOUGH, P.J., concurs.

JUSTICE APPLETON, dissenting:

For two reasons, I respectfully dissent from the portion of the majority's opinion holding that the actuarial assessments were inadmissible under *Frye*: (1) the actuarial instruments were not a scientific test; and (2) even if they were a scientific test, they were not novel.

*Frye* applies to deductions from a purportedly scientific principle, technique, or test. *Frye*, 293 F. at 1014; *Donaldson*, 199 Ill. 2d at 77, 767 N.E.2d at 324. The actuarial instruments that Buck and Reidda used do not purport to be a scientific principle, technique, or test. See *In re Commitment of R.S.*, 339 N.J. Super. 507, 540, 773 A.2d 72, 92 (2001), *aff'd*, 173 N.J. 134, 801 A.2d 219 (2002). "Rather, they are simply actuarial tables—methods of organizing and interpreting a collection of historical data." *R.S.*, 339 N.J. Super. at 540, 773 A.2d at 92. By observing what a large number of reoffenders have had in common, one can compile a list of "risk factors." *In re Detention of Isbell*, 333 Ill. App. 3d 906, 916, 777 N.E.2d 994, 1002 (2002); R. Hanson, *What Do We Know About Sex Offender Risk Assessment?*, 4 Psych. Pub. Pol. & L. 50, 56-58 (1998). One can then calculate the relative frequency with which sex offenders with those "risk factors" have reoffended and thereby assess the probability that other sex offenders with the same "risk factors" will reoffend. *Isbell*, 333 Ill. App. 3d at 916, 777 N.E.2d at 1002. The actuarial tools merely help the psycholo-

gist draw inferences from historical data or the collective experience of other psychologists. They are not a purportedly scientific device, like a polygraph.

In this regard, the tests at issue are no different than actuarial tables for life expectancy admitted as evidence to a jury for the determination of the gross amount awarded for future pain and suffering or used by an economic expert to determine the present cash value of a pension.

In *State v. Russell*, 125 Wash. 2d 24, 30-35, 882 P.2d 747, 756-58 (1994), the defendant had posed the bodies of his three murder victims (put a pinecone in the hand, a book under the arm, *et cetera*). To prove that the murderer of the three victims was probably the same person, the State's experts analyzed two computer databases consisting of "forms, filled out by local law enforcement officers, listing the various characteristics of homicides in Washington and the nation." *Russell*, 125 Wash. 2d at 69, 882 P.2d at 776. On the basis of that analysis, the experts testified to "the rarity of posed murder victims." *Russell*, 125 Wash. 2d at 69, 882 P.2d at 776. The defendant argued that the testimony was inadmissible under *Frye* because the experts "improperly relied on unproven scientific methodologies in determining that the same person committed all three murders." *Russell*, 125 Wash. 2d at 68, 882 P.2d at 776. The Supreme Court of Washington held that *Frye* was "clearly *** inapplicable" because the computer programs were "nothing more than sophisticated record-keeping systems" (*Russell*, 125 Wash. 2d at 70, 882 P.2d at 776, quoted in *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 780, 776 N.E.2d 262, 281-82 (2002), *appeal denied*, 202 Ill. 2d 598, 787 N.E.2d 154 (2002). Like the experts in *Russell*, Buck and Reidda merely drew an inference of probability from a sophisticated record-keeping system.

Even if the actuarial tools in this case were, properly speaking, scientific methodologies, they were not *novel* scientific methodologies. *Frye* bars the use of a scientific methodology only if it is "novel," *i.e.*, " '[s]trikingly new, unusual, or different.' " *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 372, 706 N.E.2d 55, 63 (1999), quoting American Heritage Dictionary of the English Language 898 (1975). The majority in this case acknowledges Doren's testimony that psychology has been using actuarial tools for almost 100 years. The majority dismisses that testimony, however, as "too general to be of any significance. The *particular* methodologies employed in this case are of recent development," the majority says. (Emphasis added.) 343 Ill. App. 3d at 1230. The supreme court has explained:

> "We recognize that a 'new' or 'novel' scientific technique is not always easy to identify, especially in light of constant scientific

advances in our modern era. Generally, however, a scientific technique is 'new' or 'novel' if it is 'original or striking' or *does 'not resembl[e] something formerly known or used.'* " (Emphasis added.) *Donaldson*, 199 Ill. 2d at 79, 767 N.E.2d at 325, quoting Webster's Third New International Dictionary 1546 (1993).

Thus, the question is not simply whether the MnSOST, MnSOST-R, VRAG, PCL-R, Static-99, and Hanson and Bussiere Meta-analysis themselves are of recent development. We must ask whether they "resemble something formerly known or used." Our society uses actuarial methods to predict human behavior all the time (in liability insurance, for example, and economics). Such methodologies are not strikingly new, unusual, or different. See W. Grove & P. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy*, 2 Psych. Pub. Pol. & L. 293, 293 (1996) (in 1928, the Illinois State Board of Parole published the results of what was apparently the first attempt to predict recidivism through actuarial data).

Defendant's own expert, Davis, used an actuarial technique, although he did not explicitly say so. In support of his opinion that defendant was unlikely to reoffend, Davis testified to a consensus "among the experts in the field that the reoffense rate for incestuous sexual molesters [was] lower than [that for] nonincestuous molesters." He also testified that because defendant's victims were female, defendant had a lower likelihood of reoffending than if they had been male. The "experts in the field" could not have determined the "reoffense rate" without an actuarial analysis. See J. Becker & W. Murphy, *What We Know and Do Not Know About Assessing and Treating Sex Offenders*, 4 Psych. Pub. Pol. & L. 116, 125 (1998) ("offenders against unrelated females had a recidivism rate of 18.3%, unrelated males 35.2%, and incest cases 8.5%"). The majority endorses an actuarial approach when it says: "Psychologists are permitted to give statistical testimony, for example, that experience has shown that certain categories of offenders are reincarcerated at a certain rate." 343 Ill. App. 3d at 1230. Apparently, Davis is permitted to do haphazardly what the State's witnesses are forbidden to do more thoroughly and systematically.

Even those who favor using the actuarial tools have criticized them or pointed out their limitations, such as a lack of comprehensiveness in the factors they consider. See, *e.g.*, R. Rogers, *The Uncritical Acceptance of Risk Assessment in Forensic Practice*, 24 L. & Human Behavior 595, 595-96 (2000) (emphasis on risk factors to the exclusion of protective factors, such as social relations, self-esteem, and religious

beliefs); Hanson, 4 Psych. Pub. Pol. & L. at 65 (emphasis on static risk factors to the exclusion of dynamic factors). Those criticisms, however, are aimed not at the actuarial approach to predicting recidivism but, rather, at the failure to properly and rigorously follow the actuarial approach. The actuarial tools that Buck and Reidda used might be, for whatever reason, an inadequate application of actuarial methodology, but that shortcoming (which defendant could bring out in cross-examination) would go to the weight of the actuarial assessments, not to their admissibility under *Frye*. See *People v. Pope*, 284 Ill. App. 3d 695, 702, 672 N.E.2d 1321, 1326 (1996). The two cases on which the majority chiefly relies, *Taylor* and *Hargett*, fail to appreciate the distinction between the well-established, underlying methodology of actuarial prediction and the particular use of that methodology.

In *Taylor*, the Second District cited no case holding that psychological or psychiatric testimony relying on actuarial assessments was inadmissible under *Frye*. In *Hargett*, the Third District cited no such case, other than *Taylor*. It appears that *Taylor* is the first reported decision in the United States to bar the use of actuarial tools to predict recidivism. It appears that courts in other jurisdictions have uniformly allowed the use of such tools. *In re Detention of Strauss*, 106 Wash. App. 1, 6-9, 20 P.3d 1022, 1025-26 (2001) (the relevant scientific community generally accepts the MnSOST and the VRAG and, therefore, a *Frye* hearing is unnecessary); *In re Detention of Holtz*, 653 N.W.2d 613, 619 (Iowa App. 2002) (MnSOST, MnSOST-R, and Static-99 are admissible); *State ex rel. Romley v. Fields*, 201 Ariz. 321, 328, 35 P.3d 82, 89 (App. 2001) (*Frye* is inapplicable to the use of actuarial models by mental health professionals); *R.S.*, 173 N.J. at 136, 801 A.2d at 220 (use of actuarial instruments to predict future dangerousness of sex offender is widely accepted within the meaning of *Frye*); *Garcetti*, 85 Cal. App. 4th at 543, 102 Cal. Rptr. 2d at 238 (psychiatrist's prediction of future dangerousness is not subject to *Frye*, regardless of whether the psychiatrist used clinical or actuarial models).

The majority, without citation beyond *Taylor*, says that the actuarial tools in this case "are controversial and have been frequently criticized." 343 Ill. App. 3d at 1230. Any approach to predicting human behavior will be controversial and frequently criticized, because the task is so complex and daunting. Yet the law requires such predictions. If psychiatrists or psychologists, on the basis of their examination of defendant, can predict his likelihood of reoffending, I do not see why they cannot at least consider actuarial assessments—which, according to the unrebutted evidence, the profession widely uses and which are less subjective than the unaided clinical judgment.

It would appear that the majority would prefer the statutorily

required testimony of psychologists to be based on sense and conjecture rather than a methodological analysis of data, imperfect as it may or may not be. I would point out that it is exactly the existence of the actuarial models here used that led to the Illinois General Assembly, as well as the legislatures of 14 other states that have adopted similar sexually-violent-person legislation, to conclude that it could, with good conscience, mandate postincarceration detention for those sexual offenders who demonstrated a risk to society.

In addition, the majority's comparison of the expert testimony here to the use of psychological expert testimony in child custody cases is unwarranted and inappropriate. First, there is simply no comparison between acceptance of psychological testimony that is statutorily required and such testimony that is proffered by a party as support for his or her position. If the majority and Gitlin have a problem with trial courts abdicating their judgment to a mental health professional, their problem is properly with judges who do so, not the psychologists who, after making such investigation as they are bound to do by their charge, provide facts and factors upon which a competent trial judge may place varying weight in making a judicial decision.